UNITRIN, INC., James E. Annable, Reuben L. Hedlund, Jerrold V. Jerome, George A. Roberts, Fayez S. Sarofim, Henry E. Singleton and Richard C. Vie, Defendants Below, Appellants,

v.

AMERICAN GENERAL CORP., Plaintiff Below, Appellee.

In re UNITRIN, INC. Shareholders Litigation.

No. 418, 1994.

Supreme Court of Delaware.

Submitted: Dec. 6, 1994.

Decided: Jan. 11, 1995.

Richard L. Sutton (argued), Thomas R. Hunt, Jr., Alan J. Stone and Michael L. Vild of Morris, Nichols, Arsht & Tunnell, Wilmington, Kenneth R. Heitz and David I. Gindler, Irell & Manella, Los Angeles, CA, for appellants.

Rodman Ward, Jr., Marc B. Tucker (argued), R. Michael Lindsey, Cathy L. Reese, Joseph M. Asher and Herbert W. Mondros of Skadden, Arps, Slate, Meagher & Flom, Wilmington, Anna J. Rastor of Skadden, Arps, Slate, Meagher & Flom, New York City, for appellee American General Corp.

Joseph A. Rosenthal and Norman M. Monhait of Rosenthal, Monhait, Gross & Goddess, Wilmington, Edward Labaton (argued), and Ira A. Schochet of Goodkind, Labaton Rudoff & Sucharow, New York City, for appellees Unitrin Shareholders.

Before VEASEY, C.J., HOLLAND and BERGER, JJ.

HOLLAND, Justice.

This is an appeal from the Court of Chancery's entry of a preliminary injunction on October 13, 1994, upon plaintiffs' motions in two actions: American General Corporation's ("American General") suit against Unitrin, Inc. ("Unitrin") and its directors; and a parallel class action brought by Unitrin stockholders.[1] An interlocutory appeal was certified by the Court of Chancery on October 24, 1994. This Court accepted the appeal on October 27, 1994.

American General, which had publicly announced a proposal to merge with Unitrin for $2.6 billion at $50-⅜ per share, and certain Unitrin shareholder plaintiffs, filed suit in the Court of Chancery, *inter alia,* to enjoin Unitrin from repurchasing up to 10 million shares of its own stock (the "Repurchase

---

1. The Court of Chancery's Opinion of October 13, 1994, was revised October 14, 1994.

Program").[2]  On August 26, 1994, the Court of Chancery temporarily restrained Unitrin from making any further repurchases.  After expedited discovery, briefing and argument, the Court of Chancery preliminarily enjoined Unitrin from making further repurchases on the ground that the Repurchase Program was a disproportionate response to the threat posed by American General's inadequate all cash for all shares offer, under the standard of this Court's holding in *Unocal Corp. v. Mesa Petroleum Co.,* Del.Supr., 493 A.2d 946 (1985) (*"Unocal"*).

## Unitrin's Contentions

Unitrin has raised several issues in this appeal.  First, it contends that the Court of Chancery erred in assuming that the outside directors would subconsciously act contrary to their substantial financial interests as stockholders and, instead, vote in favor of a subjective desire to protect the "prestige and perquisites" of membership on Unitrin's Board of Directors.  Second, it contends that the Court of Chancery erred in holding that the adoption of the Repurchase Program would materially affect the ability of an insurgent stockholder to win a proxy contest.  According to Unitrin, that holding is unsupported by the evidence, is based upon a faulty mathematical analysis, and disregards the holding of *Moran v. Household Int'l, Inc.,* Del.Supr., 500 A.2d 1346, 1355 (1985).  Furthermore, Unitrin argues that the Court of Chancery erroneously substituted its own judgment for that of Unitrin's Board, contrary to this Court's subsequent interpretations of *Unocal* in *Paramount Communications, Inc. v. QVC Network, Inc.,* Del.Supr., 637 A.2d 34, 45–46 (1994), and *Paramount Communications, Inc. v. Time, Inc.,* Del. Supr., 571 A.2d 1140 (1990).  Third, Unitrin submits that the Court of Chancery erred in finding that the plaintiffs would be irreparably harmed absent an injunction (a) because the Court of Chancery disregarded Unitrin's proffered alternative remedy of sterilizing the increased voting power of the stockholder

directors and (b) because there was no basis for finding that stockholders who sold into the market during the pendency of the Repurchase Program would be irreparably harmed.

## This Court

## Ultimate Disposition

█  This Court has concluded that the Court of Chancery erred in applying the proportionality review *Unocal* requires by focusing upon whether the Repurchase Program was an "unnecessary" defensive response.  *See Paramount Communications, Inc. v. QVC Network, Inc.,* 637 A.2d at 45–46.  The Court of Chancery should have directed its enhanced scrutiny: first, upon whether the Repurchase Program the Unitrin Board implemented was draconian, by being either preclusive or coercive and; second, if it was not draconian, upon whether it was within a range of reasonable responses to the threat American General's Offer posed.  Consequently, the interlocutory preliminary injunctive judgment of the Court of Chancery is reversed.  This matter is remanded for further proceedings in accordance with this opinion.

## The Parties

American General is the largest provider of home service insurance.  On July 12, 1994, it made a merger proposal to acquire Unitrin for $2.6 billion at $50-⅜ per share.  Following a public announcement of this proposal, Unitrin shareholders filed suit seeking to compel a sale of the company.  American General filed suit to enjoin Unitrin's Repurchase Program.

Unitrin is also in the insurance business. It is the third largest provider of home service insurance.  The other defendants-appellants are the members of Unitrin's seven person Board of Directors (the "Unitrin Board" or "Board").  Two directors are em-

---

**2.**  The actions are styled *American General Corp. v. Unitrin, Inc., et al.,* C.A. No. 13699 and *In re*
*Unitrin Inc. Shareholders' Litigation,* Consolidated C.A. No. 13656.

ployees, Richard C. Vie ("Vie"), the Chief Executive Officer, and Jerrold V. Jerome ("Jerome"), Chairman of the Board. The five remaining directors are not and have never been employed by Unitrin. These directors are:

(1) Dr. Henry E. Singleton ("Singleton"), who co-founded Teledyne, Inc. (from which Unitrin is a spin-off) in 1961, and served as its Chairman and Chief Executive Officer until 1988. He is Unitrin's largest shareholder, owning 7,242,260 shares, in excess of 14% of the outstanding stock;

(2) Fayez S. Sarofim ("Sarofim"), the Chief Executive Officer and 70% owner of Fayez Sarofim & Co., which manages over $23 billion in investments for its clients. Sarofim personally owns 1,062,335 shares of Unitrin common stock, 2.26% of the outstanding stock;

(3) Dr. George A. Roberts ("Roberts"), retired Chairman and former President of Teledyne, Inc. He owns more than 400,-000 shares of Unitrin stock. Dr. Roberts managed Teledyne's operations for more than 25 years and was apparently responsible for acquiring the companies that make up Unitrin's core businesses;

(4) James E. Annable ("Annable"), Chief Economist for First National Bank of Chicago and a former professor of economics at the Massachusetts Institute of Technology; and

(5) Reuben L. Hedlund ("Hedlund"), a trial lawyer in Chicago, with experience in antitrust law.

The record reflects that the non-employee directors each receive a fixed annual fee of $30,000. They receive no other significant financial benefit from serving as directors. At the offering price proposed by American General, the value of Unitrin's non-employee directors' stock exceeded $450 million.

### American General's Offer

In January 1994, James Tuerff ("Tuerff"), the President of American General, met with Richard Vie, Unitrin's Chief Executive Officer. Tuerff advised Vie that American General was considering acquiring other companies. Unitrin was apparently at or near the top of its list. Tuerff did not mention any terms for a potential acquisition of Unitrin. Vie replied that Unitrin had excellent prospects as an independent company and had never considered a merger. Vie indicated to Tuerff that Unitrin was not for sale.

According to Vie, he reported his conversation with Tuerff at the next meeting of the Unitrin Board in February 1994. The minutes of the full Board meeting do not reflect a discussion of Tuerff's proposition. Nevertheless, the parties agree that the Board's position in February was that Unitrin was not for sale. It was unnecessary to respond to American General because no offer had been made.

On July 12, 1994, American General sent a letter to Vie proposing a consensual merger transaction in which it would "purchase all of Unitrin's 51.8 million outstanding shares of common stock for $50–⅜ per share, in cash" (the "Offer"). The Offer was conditioned on the development of a merger agreement and regulatory approval. The Offer price represented a 30% premium over the market price of Unitrin's shares. In the Offer, American General stated that it "would consider offering a higher price" if "Unitrin could demonstrate additional value." American General also offered to consider tax-free "[a]lternatives to an all cash transaction."

### Unitrin's Rejection

Upon receiving the American General Offer, the Unitrin Board's Executive Committee (Singleton, Vie, and Jerome) engaged legal counsel and scheduled a telephonic Board meeting for July 18. At the July 18 special meeting, the Board reviewed the terms of the Offer. The Board was advised that the existing charter and bylaw provisions might not effectively deter all types of takeover strategies. It was suggested that the Board consider adopting a shareholder rights plan and an advance notice provision for shareholder proposals.

The Unitrin Board met next on July 25, 1994 in Los Angeles for seven hours.[3] All directors attended the meeting. The principal purpose of the meeting was to discuss American General's Offer.

Vie reviewed Unitrin's financial condition and its ongoing business strategies. The Board also received a presentation from its investment advisor, Morgan Stanley & Co. ("Morgan Stanley"), regarding the financial adequacy of American General's proposal. Morgan Stanley expressed its opinion that the Offer was financially inadequate.[4] Legal counsel expressed concern that the combination of Unitrin and American General would raise antitrust complications due to the resultant decrease in competition in the home service insurance markets.

The Unitrin Board unanimously concluded that the American General merger proposal was not in the best interests of Unitrin's shareholders and voted to reject the Offer.[5] The Board then received advice from its legal and financial advisors about a number of possible defensive measures it might adopt, including a shareholder rights plan ("poison pill")[6] and an advance notice bylaw provision for shareholder proposals. Because the Board apparently thought that American General intended to keep its Offer private, the Board did not implement any defensive measures at that time.

On July 26, 1994, Vie faxed a letter to Tuerff, rejecting American General's Offer. That correspondence stated:

> As I told you back in January, when you first proposed acquiring our company, we are not for sale. The Board believed then, and believes even more strongly today, that the company's future as an independent enterprise is excellent and will provide greater long-term benefits to the company, our stockholders and our other constituencies than pursuing a sale transaction.
>
> Accordingly, we don't view a combination with you as part of our future and our Board is unanimous and unequivocal that we should not pursue it.
>
> The Board has specifically directed me to say that we assume you do not want to create an adversarial situation and that you agree with us it would be counterproductive to do so. But our Board is very firm in its conclusion about your offer and if our assumption about your intentions proves to be incorrect, Unitrin has, as you know, the financial capacity to pursue all avenues the Board considers appropriate.

Vie acknowledged during discovery that the latter portion of his letter referred, in part, to the Repurchase Program.

---

3. Prior to the meeting, Unitrin's outside counsel, Irell & Manella ("Irell"), sent Unitrin a draft press release and script for the meeting. These documents contemplated the adoption of the poison pill, advance notice provision and the Repurchase Program. American General argues that this shows that the Board action was a *fait accompli*. The Unitrin defendants argue that it was contingency planning.

4. Eric Daut, who prepared these materials for Morgan Stanley under extreme time pressure, had never prepared such information previously and did not rely on firm figures. Morgan Stanley, in turn, did not investigate these figures.

5. The Court of Chancery noted there was "circumstantial evidence that the [Unitrin] board made its decision to reject the American General offer before their official review of the offer at the July 25 meeting," but was "reluctant to resolve this difficult factual dispute at this stage," and assumed *arguendo* that the Board "made its decision to reject the offer at the July 25 meeting

after evaluating the Morgan Stanley presentation."

6. A poison pill is a defensive mechanism adopted by corporations that wish to prevent unwanted takeovers. Upon the occurrence of certain 'triggering' events, such as a would-be acquiror's purchase of a certain percentage of the target corporation's shares, or the announcement of a tender offer, all existing shareholders, except for the would-be acquiror, get the right to purchase debt or stock of the target at a discount. This action dilutes the would-be acquiror's stake in the company and increases the costs of acquisition. Robert J. Klein, *The Case for Heightened Scrutiny in Defense of the Shareholders' Franchise Right*, 44 Stan.L.Rev. 129, 129 n. 6 (1991). For a discussion of poison pills and their possible "flip over" or "flip in" features, see Jeffrey N. Gordon, *Corporations, Markets and Courts*, 91 Colum.L.Rev. 1931, 1937–38 n. 21 (1991).

*American General's Publicity*

*Unitrin's Initial Responses*

On August 2, 1994, American General issued a press release announcing its Offer to Unitrin's Board to purchase all of Unitrin's stock for $50–⅞ per share. The press release also noted that the Board had rejected American General's Offer. After that public announcement, the trading volume and market price of Unitrin's stock increased.

At its regularly scheduled meeting on August 3, the Unitrin Board discussed the effects of American General's press release. The Board noted that the market reaction to the announcement suggested that speculative traders or arbitrageurs were acquiring Unitrin stock. The Board determined that American General's public announcement constituted a hostile act designed to coerce the sale of Unitrin at an inadequate price. The Board unanimously approved 'the poison pill and the proposed advance notice bylaw that it had considered previously.

Beginning on August 2 and continuing through August 12, 1994, Unitrin issued a series of press releases to inform its shareholders and the public market: first, that the Unitrin Board believed Unitrin's stock was worth more than the $50–⅞ American General offered; second, that the Board felt that the price of American General's Offer did not reflect Unitrin's long term business prospects as an independent company; third, that "the true value of Unitrin [was] not reflected in the [then] current market price of its common stock," and that because of its strong financial position, Unitrin was well positioned "to pursue strategic and financial opportunities;" fourth, that the Board believed a merger with American General would have anticompetitive effects and might violate antitrust laws and various state regulatory statutes; and fifth, that the Board had adopted a shareholder rights plan (poison pill) to guard against undesirable takeover efforts.

*Unitrin's Repurchase Program*

The Unitrin Board met again on August 11, 1994. The minutes of that meeting indicate that its principal purpose was to consider the Repurchase Program. At the Board's request, Morgan Stanley had prepared written materials to distribute to each of the directors. Morgan Stanley gave a presentation in which alternative means of implementing the Repurchase Program were explained. Morgan Stanley recommended that the Board implement an open market stock repurchase. The Board voted to authorize the Repurchase Program for up to ten million shares of its outstanding stock.

On August 12, Unitrin publicly announced the Repurchase Program. The Unitrin Board expressed its belief that "Unitrin's stock is undervalued in the market and that the expanded program will tend to increase the value of the shares that remain outstanding." The announcement also stated that the director stockholders were not participating in the Repurchase Program, and that the repurchases "will increase the percentage ownership of those stockholders who choose not to sell."

Unitrin's August 12 press release also stated that the directors owned 23% of Unitrin's stock, that the Repurchase Program would cause that percentage to increase, and that Unitrin's certificate of incorporation included a supermajority voting provision. The following language from a July 22 draft press release revealing the antitakeover effects of the Repurchase Program was omitted from the final press release.

> Under the [supermajority provision], the consummation of the expanded repurchase program would enhance the ability of non-selling stockholders, including the directors, to prevent a merger with a greater-than-15% stockholder if they did not favor the transaction.

Unitrin sent a letter to its stockholders on August 17 regarding the Repurchase Program which stated:

> Your Board of Directors has authorized the Company to repurchase, in the open market or in private transactions, up to 10 million of Unitrin's 51.8 million outstanding

common shares. This authorization is intended to provide an additional measure of liquidity to the Company's shareholders in light of the unsettled market conditions resulting from American General's unsolicited acquisition proposal. The Board believes that the Company's stock is undervalued and that this program will tend to increase the value of the shares that remain outstanding.

Between August 12 and noon on August 24, Morgan Stanley purchased nearly 5 million of Unitrin's shares on Unitrin's behalf. The average price paid was slightly above American General's Offer price.

### Procedural Posture

It is important to begin our review by recognizing and emphasizing the procedural posture of this case in the Court of Chancery as well as in this Court. The Court of Chancery granted the plaintiffs' request for a preliminary injunction. After the Court of Chancery entered the preliminary injunction, it certified an appeal from that interlocutory ruling. Supr.Ct.R. 42. This Court accepted the interlocutory appeal and has expedited its review.

■ The legal paradigm which guides the Court of Chancery before entering a preliminary injunction is well established. First, the plaintiff must demonstrate a reasonable probability of success on the merits at trial. *Mills Acquisition Co. v. Macmillan, Inc.,* Del.Supr., 559 A.2d 1261, 1278 (1989). Second, the plaintiff must prove a reasonable probability of irreparable harm in the absence of such preliminary injunctive relief. *Id.* Finally, the plaintiff must convince the Court of.Chancery that, after balancing the relative hardships to the parties involved, the

harm to the plaintiff if injunctive relief is denied outweighs the harm to the defendant if the relief is granted. *Id.* at 1278–79; *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.,* Del.Supr., 506 A.2d 173, 179 (1986).

### Nature of Proceeding

### Determines Judicial Review

■ In this case, before the Court of Chancery could evaluate the reasonable probability of the plaintiffs' success on the merits, it had to determine the nature of the proceeding. When shareholders challenge directors' actions, usually one of three levels of judicial review is applied: the traditional business judgment rule, the *Unocal* standard of enhanced judicial scrutiny, or the entire fairness analysis.[7] "Because the effect of the proper invocation of the business judgment rule is so powerful and the standard of entire fairness so exacting, the determination of the appropriate standard of judicial review frequently is determinative of the outcome of [the] litigation." *Mills Acquisition Co. v. Macmillan, Inc.,* 559 A.2d at 1279 (*citing AC Acquisitions Corp. v. Anderson, Clayton & Co.,* Del.Ch., 519 A.2d 103, 111 (1986)).

The plaintiffs initially argued that Unitrin's Board put the corporation up for sale by implementing the Repurchase Program. *See Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.,* 506 A.2d at 182. The Court of Chancery ruled, however, that the plaintiffs had not established with reasonable probability that the Repurchase Program constituted a change of control from Unitrin's public stockholders to the stockholder directors. *See Paramount Communications, Inc. v. QVC Network, Inc.,* Del.Supr., 637 A.2d 34 (1994). The ruling is not at issue in this interlocutory appeal.

7. The entire fairness standard applies "only if the presumption of the business judgment rule is defeated." *Grobow v. Perot,* Del.Supr., 539 A.2d 180, 187 (1988) (*citing Aronson v. Lewis,* Del. Supr., 473 A.2d 805, 812–17 (1984)). The entire fairness standard is exacting and requires judicial scrutiny regarding both "fair dealing" and "fair price." *Mills Acquisition Co. v. Macmillan, Inc.,* Del.Supr., 559 A.2d 1261, 1280 (1989) (*cit-* *ing Weinberger v. UOP, Inc.,* Del.Supr., 457 A.2d 701, 711 (1983)). *See* Dennis J. Block, et al., *Chancellor Allen, The Business Judgment Rule, and the Shareholders' Right to Decide,* 17 Del. J.Corp.Law 785, 792 (1992). The entire fairness test is codified and has been construed by this Court many times. *See* 8 *Del.C.* § 144(a)(3). *See also Ivanhoe Partners v. Newmont Mining Corp.,* Del.Supr., 535 A.2d 1334 (1987).

The plaintiffs alternatively argued that the conduct of the Unitrin Board should be examined under the entire fairness standard. The Court of Chancery concluded that the Board's implementation of the poison pill and the Repurchase Program, in response to American General's Offer, did not constitute self-dealing that would require the Unitrin Board to demonstrate entire fairness. *See Nixon v. Blackwell,* Del.Supr., 626 A.2d 1366, 1376 (1993); *Weinberger v. UOP, Inc.,* Del. Supr., 457 A.2d 701, 710 (1983). Consequently, the Court of Chancery addressed the plaintiffs' third alternative argument, that the Unitrin Board's actions should be examined under the standard of enhanced judicial scrutiny this Court set forth in *Unocal.*

### Unitrin Board's Actions Defensive

### Unocal is Proper Review Standard

▮ Before a board of directors' action is subject to the *Unocal* standard of enhanced judicial scrutiny, the court must determine whether the particular conduct was defensive.[8] The stockholder-plaintiffs asked the Court of Chancery to review both the poison pill and the Repurchase Program pursuant to the *Unocal* standard. American General requested the Court of Chancery to apply *Unocal* and enjoin the Repurchase Program only. Unitrin acknowledged that the poison pill was subject to the enhanced scrutiny *Unocal* requires but argued that the Court of Chancery should evaluate the Repurchase Program under the business judgment rule.

According to the Unitrin Board, the Repurchase Program was enacted for a valid business purpose and, therefore, should not be evaluated as a defensive measure under

*Unocal.* The Court of Chancery agreed that, had the Board enacted the Repurchase Program independent of a takeover proposal, its decision would be reviewed under the traditional business judgment rule. The Court of Chancery concluded, however, that the Unitrin Board perceived American General's Offer as a threat and, from the timing of the consideration and implementation of the Repurchase Program, adopted the Repurchase Program as one of several defensive measures in response to that threat. Unitrin does not dispute that conclusion for the purpose of this interlocutory appeal.

▮ The Court of Chancery held that all of the Unitrin Board's defensive actions merited judicial scrutiny according to *Unocal.*[9] The record supports the Court of Chancery's determination that the Board perceived American General's Offer as a threat and adopted the Repurchase Program, along with the poison pill and advance notice bylaw, as defensive measures in response to that threat. Therefore, the Court of Chancery properly concluded the facts before it required an application of *Unocal* and its progeny. *See Stroud v. Grace,* Del.Supr., 606 A.2d 75, 82 (1992). The evolution of that jurisprudence is didactic.

### Unocal's Standard

### Business Judgment Rule

### Enhanced Judicial Scrutiny

▮ The business judgment rule applies to the conduct of directors in the context of a takeover. *See Pogostin v. Rice,* Del.Supr., 480 A.2d 619 (1984); *Aronson v. Lewis,* Del.

---

8. *See* Dennis J. Block, et al., *The Business Judgment Rule,* 243 (4th ed. 1993).

9. We agree that the Court of Chancery properly applied a *Unocal* analysis to the Repurchase Program after it concluded the Repurchase Program was a component of Unitrin's defense, notwithstanding Unitrin's initial argument that its Board did not consider the Repurchase Program to be a part of its defensive response to American General's Offer. *See Henley Group, Inc. v. Santa Fe S. Pac. Corp.,* Del.Ch., 13 Del.J.Corp.L. 1152 (1988).

*Compare Shamrock Holdings, Inc. v. Polaroid Corp.,* Del.Ch., 559 A.2d 257, 271 (1989). *Unocal's* standard of enhanced judicial scrutiny is proper whenever the record reflects that a board of directors took defensive measures in response to a "perceived 'threat to corporate policy and effectiveness which touches upon issues of control.'" *Stroud v. Grace,* Del.Supr., 606 A.2d 75, 82 (1992) *(quoting Gilbert v. El Paso Co.,* Del. Supr., 575 A.2d 1131, 1144 (1990)).

Supr., 473 A.2d 805, 812 (1984).[10] *Accord Paramount Communications, Inc. v. QVC Network, Inc.*, Del.Supr., 637 A.2d 34, 41–42 (1994). The business judgment rule is a "presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Aronson v. Lewis*, 473 A.2d at 812.[11] An application of the traditional business judgment rule places the burden on the "party challenging the [board's] decision to establish facts rebutting the presumption." *Id.* If the business judgment rule is not rebutted, a "court will not substitute its judgment for that of the board if the [board's] decision can be 'attributed to any rational business purpose.'" *Unocal*, 493 A.2d at 954 (citation omitted).

■ In *Unocal*, this Court reaffirmed "the application of the business judgment rule in the context of a hostile battle for control of a Delaware corporation where board action is taken to the exclusion of, or in limitation upon, a valid stockholder vote." *Stroud v. Grace*, 606 A.2d at 82. This Court has recognized that directors are often confronted with an "'inherent conflict of interest' during contests for corporate control '[b]ecause of the omnipresent specter that a board may be acting primarily in its own interests, rather than those of the corporation and its shareholders.'" *Id.* (quoting *Unocal*, 493 A.2d at 954). Consequently, in such situations, before the board is accorded the protection of the business judgment rule, and that rule's concomitant placement of the burden to rebut its presumption on the plaintiff, the board must carry its own initial two-part burden:

First, a *reasonableness test*, which is satisfied by a demonstration that the board of directors had reasonable grounds for believing that a danger to corporate policy and effectiveness existed, and

Second, a *proportionality test*, which is satisfied by a demonstration that the board of directors' defensive response was reasonable in relation to the threat posed.

*Unocal*, 493 A.2d at 955. *See also Moran v. Household Int'l, Inc.*, Del.Supr., 500 A.2d 1346, 1356 (1985). The common law pronouncement in *Unocal* of enhanced judicial scrutiny, as a threshold or condition precedent to an application of the traditional business judgment rule, is now well known.[12]

■ The enhanced judicial scrutiny mandated by *Unocal* is not intended to lead to a structured, mechanistic, mathematical exercise.[13] *Paramount Communications, Inc. v. Time, Inc.*, Del.Supr., 571 A.2d 1140, 1153

10. The standards by which director conduct is measured in the context of a takeover include the "hallmark" principle that a court will not substitute its judgment for that of a board if the latter's decision can be attributed to any rational business purpose:

When a board addresses a pending takeover bid it has an obligation to determine whether the offer is in the best interests of the corporation and its shareholders. In that respect a board's duty is no different from any other responsibility it shoulders, and its decisions should be no less entitled to the respect they otherwise would be accorded in the realm of business judgment.

*Unocal*, 493 A.2d at 954 (footnote omitted).

11. *See also* David A. Drexler, et al., *Delaware Corporation Law and Practice*, § 15.03 (1994).

12. *Paramount Communications, Inc. v. QVC Network, Inc.*, Del.Supr., 637 A.2d 34 (1994); *Stroud v. Grace*, Del.Supr., 606 A.2d 75 (1992); *Gilbert v. El Paso Co.*, Del.Supr., 575 A.2d 1131 (1990); *Paramount Communications, Inc. v. Time, Inc.*, Del.Supr., 571 A.2d 1140 (1990); *Mills Acquisition Co. v. Macmillan, Inc.*, Del.Supr., 559 A.2d 1261 (1989); *Ivanhoe Partners v. Newmont Mining Corp.*, Del.Supr., 535 A.2d 1334 (1987); *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, Del.Supr., 506 A.2d 173 (1986); *Moran v. Household Int'l, Inc.*, Del.Supr., 500 A.2d 1346 (1985).

13. Efforts to relate *Unocal*'s inherently qualitative proportionality test to a quantitative formula have demonstrated the fallacy of such an exercise, *e.g.*, the reasonableness test:

the reasonableness test requires a court to engage in a "calculus" of harms: a factual determination of what course of action is in the shareholders' best interests. Set forth in terms of an equation, an antitakeover device is in the shareholders' best interests if

$$(FV - TP)(pFV) - (TP - SV)(pSV) > 0$$

where "FV" is a "full" value greater than the tender price, "TP" is the tender price, "pFV" is the probability of realizing this "full" value if the antitakeover device is maintained, "SV" is

(1990). Conversely, it is not intended to be an abstract theory. *Id.* The *Unocal* standard is a flexible paradigm that jurists can apply to the myriad of "fact scenarios" that confront corporate boards. *Id.*

*Parties' Burdens Shift*

*Judicial Review Standards Differ*

*Business Judgment Rule and Unocal*

■ The correct analytical framework is essential to a proper review of challenges to the decision-making process of a corporate Board. *Nixon v. Blackwell,* Del.Supr., 626 A.2d 1366, 1375 (1993). The ultimate question in applying the *Unocal* standard is: what deference should the reviewing court give "to the decisions of directors in defending against a takeover?" E. Norman Veasey, *The New Incarnation of the Business Judgment Rule in Takeover Defenses,* 11 Del. J.Corp.L. 503, 504–05 (1986). The question is usually presented to the Court of Chancery, as in the present case, in an injunction proceeding, a posture which is known as "transactional justification." *Id.* To answer the question, the enhanced judicial scrutiny *Unocal* requires implicates both the substantive and procedural nature of the business judgment rule.[14]

■ The business judgment rule has traditionally operated to shield directors from personal liability arising out of completed actions involving operational issues. *Id.* When the business judgment rule is applied to defend directors against personal liability, as in a derivative suit, the plaintiff has the initial burden of proof and the ultimate burden of persuasion. *See Spiegel v. Buntrock,*

Del.Supr., 571 A.2d 767, 774 (1990). In such cases, the business judgment rule shields directors from personal liability if, upon review, the court concludes the directors' decision can be attributed to any rational business purpose. *See Sinclair Oil Corp. v. Levien,* Del.Supr., 280 A.2d 717, 720 (1971).

■ Conversely, in transactional justification cases involving the adoption of defenses to takeovers, the director's actions invariably implicate issues affecting stockholder rights. *See Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.,* Del.Supr., 506 A.2d 173, 180 n. 10 (1986). In transactional justification cases, the directors' decision is reviewed judicially and the burden of going forward is placed on the directors. *See* Joseph Hinsey, IV, *Business Judgment and the American Law Institute's Corporate Governance Project: the Rule, the Doctrine and the Reality,* 52 Geo.Wash.L.Rev., 609, 611–13 (1984). If the directors' actions withstand *Unocal's* reasonableness and proportionality review, the traditional business judgment rule is applied to shield the directors' defensive decision rather than the directors themselves. *Id.*

■ The litigation between Unitrin, American General, and the Unitrin shareholders in the Court of Chancery is a classic example of a transactional justification case. The Court of Chancery's determination that the conduct of Unitrin's Board was subject to *Unocal's* enhanced judicial scrutiny required it to evaluate each party's ability to sustain its unique burden in the procedural context of a preliminary injunction proceeding. The plaintiff's burden in such a proceeding is to demonstrate a reasonable probability of success after trial.

---

, the subsequent value of the target's stock if the directors have not realized the "full" value and the tender offer is withdrawn or revised downwards, and "pSV" is the probability that SV shall occur. The only factor in the reasonableness equation which is precisely known is TP; the value of the other quantities may only be approximated.

George H. Kanter, Comment, *Judicial Review of Antitakeover Devices Employed in the Noncoercive Tender Offer Context: Making Sense of the Unocal*

*Test,* 138 U.Pa.L.Rev., 225, 254–55 (1989) (footnote omitted).

14. One federal court has described the judicial role in assessing defensive measures in the hostile tender offer context pursuant to *Unocal* as "an intricate composite of deference to the business expertise of the directors and close scrutiny of incumbent management decisions." *BNS, Inc. v. Koppers Co.,* 683 F.Supp. 458, 473 (D.Del. 1988).

■ In general, to effectively defeat the plaintiff's ability to discharge that burden, a board must sustain its burden of demonstrating that, even under *Unocal's* standard of enhanced judicial scrutiny, its actions deserved the protection of the traditional business judgment rule. Thus, the plaintiff's likelihood of success in obtaining a preliminary injunction was initially dependent upon the inability of the Unitrin Board to discharge the burden placed upon it first by *Unocal.* Accordingly, having concluded that the Board's actions were defensive, the Court of Chancery logically began with an evaluation of the Unitrin Board's evidence.

### American General Threat

### Reasonableness Burden Sustained

■ The first aspect of the *Unocal* burden, the reasonableness test, required the Unitrin Board to demonstrate that, after a reasonable investigation, it determined in good faith, that American General's Offer presented a threat to Unitrin that warranted a defensive response. This Court has held that the presence of a majority of outside independent directors will materially enhance such evidence. *Unocal,* 493 A.2d at 955. *Accord Paramount Communications, Inc. v. Time, Inc.,* Del.Supr., 571 A.2d 1140, 1154 (1990); *Polk v. Good,* Del.Supr., 507 A.2d 531, 537 (1986); *Moran v. Household Int'l, Inc.,* Del.Supr., 500 A.2d 1346, 1356 (1985). An "outside" director has been defined as a non-employee and non-management director, (*e.g.,* Unitrin argues, five members of its

seven-person Board). *See Grobow v. Perot,* Del.Supr., 539 A.2d 180, 184 n. 1 (1988). Independence "means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences." *Aronson v. Lewis,* Del.Supr., 473 A.2d 805, 816 (1984).[15]

The Unitrin Board identified two dangers it perceived the American General Offer posed: inadequate price and antitrust complications. The Court of Chancery characterized the Board's concern that American General's proposed transaction could never be consummated because it may violate antitrust laws and state insurance regulations as a "makeweight excuse" for the defensive measure. It determined, however, that the Board reasonably believed that the American General Offer was inadequate and also reasonably concluded that the Offer was a threat to Unitrin's uninformed stockholders.

■ The Court of Chancery held that the Board's evidence satisfied the first aspect or reasonableness test under *Unocal.* The Court of Chancery then noted, however, that the threat to the Unitrin stockholders from American General's inadequate opening bid was "mild," because the Offer was negotiable both in price and structure.[16] The court then properly turned its attention to *Unocal's* second aspect, the proportionality test because "[i]t is not until both parts of the *Unocal* inquiry have been satisfied that the business judgment rule attaches to defensive actions of a board of directors." *Paramount Com-*

---

**15.** American General argues that the Unitrin Board's investigation is not entitled to "material enhancement" under *Unocal* because the Board does not consist of a majority of outside, independent directors. According to American General, even if five of the seven Unitrin directors are "outside directors," they are not independent because they are dominated by Singleton. Although the Court of Chancery did not address the issue of domination in this pre-trial proceeding, its conclusion that the Board sustained its first *Unocal* burden of demonstrating reasonableness is an implicit rejection of American General's argument. Nevertheless, we recognize that final determinations regarding domination are usually

made after a full trial. *See Aronson v. Lewis,* Del.Supr., 473 A.2d 805, 815–16 (1984). *Cf. Rales v. Blasband,* Del.Supr., 634 A.2d 927, 936–37 (1993).

**16.** A board's response to an offer to merge is traditionally tested by the business judgment rule since a statutory prerequisite (8 *Del.C.* § 251(b)) to a merger transaction is approval by the Board before any stockholder action. *See Paramount Communications, Inc. v. Time, Inc.,* 571 A.2d at 1142.

*munications, Inc. v. Time, Inc.,* 571 A.2d at 1154.[17] *See Unocal,* 493 A.2d at 955.

### Proportionality Burden

### Chancery Approves Poison Pill

The second aspect or proportionality test of the initial *Unocal* burden required the Unitrin Board to demonstrate the proportionality of its response to the threat American General's Offer posed. The record reflects that the Unitrin Board considered three options as defensive measures: the poison pill, the advance notice bylaw, and the Repurchase Program. The Unitrin Board did not act on any of these options on July 25.

On August 2, American General made a public announcement of its offer to buy all the shares of Unitrin for $2.6 billion at $50-⅜ per share. The Unitrin Board had already concluded that the American General offer was inadequate. It also apparently feared that its stockholders did not realize that the long term value of Unitrin was not reflected in the market price of its stock.

On August 3, the Board met to decide whether any defensive action was necessary. The Unitrin Board decided to adopt defensive measures to protect Unitrin's stockholders from the inadequate American General Offer in two stages: first, it passed the poison pill and the advance notice bylaw; and, a week later, it implemented the Repurchase Program.

■ With regard to the second aspect or proportionality test of the initial *Unocal* burden, the Court of Chancery analyzed each stage of the Unitrin Board's defensive responses separately. Although the Court of Chancery characterized Unitrin's antitrust concerns as "makeweight," it acknowledged that the directors of a Delaware corporation have the prerogative to determine that the market undervalues its stock and to protect its stockholders from offers that do not reflect the long term value of the corporation under its present management plan. *Para-*

*mount Communications, Inc. v. Time, Inc.,* 571 A.2d at 1153. The Court of Chancery concluded that Unitrin's Board believed in good faith that the American General Offer was inadequate and properly employed a poison pill as a proportionate defensive response to protect its stockholders from a "low ball" bid.

No cross-appeal was filed in this expedited interlocutory proceeding. Therefore, the Court of Chancery's ruling that the Unitrin Board's adoption of a poison pill was a proportionate response to American General's Offer is not now directly at issue. Nevertheless, to the extent the Unitrin Board's prior adoption of the poison pill influenced the Court of Chancery's proportionality review of the Repurchase Program, the Board's adoption of the poison pill is also a factor to be considered on appeal by this Court.

### Proportionality Burden

### Chancery Enjoins Repurchase Program

The Court of Chancery did not view either its conclusion that American General's Offer constituted a threat, or its conclusion that the poison pill was a reasonable response to that threat, as requiring it, *a fortiori,* to conclude that the Repurchase Program was also an appropriate response. The Court of Chancery then made two factual findings: first, the Repurchase Program went beyond what was "necessary" to protect the Unitrin stockholders from a "low ball" negotiating strategy; and second, it was designed to keep the decision to combine with American General within the control of the members of the Unitrin Board, as stockholders, under virtually all circumstances. Consequently, the Court of Chancery held that the Unitrin Board failed to demonstrate that the Repurchase Program met the second aspect or

---

**17.** In *Time,* this Court expressly rejected the proposition that "once the board's deliberative process has been analyzed and found not to be wanting in objectivity, good faith or deliberative-ness, the so-called 'enhanced' business judgment rule has been satisfied and no further inquiry is undertaken." *Paramount Communications, Inc. v. Time, Inc.,* 571 A.2d at 1154 n. 18.

proportionality requirement of the initial burden *Unocal* ascribes to a board of directors.

The Court of Chancery framed the ultimate question before it as follows:

This case comes down to one final question: Is placing the decision to sell the company in the hands of stockholders who are also directors a disproportionate response to a low price offer to buy all the shares of the company for cash?

The Court of Chancery then answered that question:

I conclude that because the only threat to the corporation is the inadequacy of an opening bid made directly to the board, and the board has already taken actions that will protect the stockholders from mistakenly falling for a low ball negotiating strategy, a repurchase program that intentionally provides members of the board with a veto of any merger proposal is not reasonably related to the threat posed by American General's negotiable all shares, all cash offer.

In explaining its conclusion, the Court of Chancery reasoned that:

I have no doubt that a hostile acquiror can make an offer high enough to entice at least some of the directors that own stock to break ranks and sell their shares. Yet, these directors undoubtedly place a value, probably a substantial one, on their management of Unitrin, and will, at least subconsciously, reject an offer that does not compensate them for that value. . . . The prestige and perquisites that accompany managing Unitrin as a member of its Board of directors, even for the non-officer directors that do not draw a salary, may

cause these stockholder directors to reject an excellent offer unless it includes this value in its "price parameter."

■ The Court of Chancery concluded that, although the Unitrin Board had properly perceived American General's inadequate Offer as a threat and had properly responded to that threat by adopting a "poison pill," the additional defensive response of adopting the Repurchase Program was unnecessary and disproportionate to the threat the Offer posed. Accordingly, it concluded that the plaintiffs had "established with reasonable probability that the [Unitrin Board] violated its duties under *Unocal* [by authorizing the Repurchase Program]" because the Board had not sustained its burden of demonstrating that the Repurchase Program was a proportionate response to American General's Offer. Therefore, the Court of Chancery held that the plaintiffs proved a likelihood of success on that issue and granted the motion to preliminarily enjoin the Repurchase Program.[18]

*Proxy Contest*

*Supermajority Vote*

*Repurchase Program*

Before the Repurchase Program began, Unitrin's directors collectively held approximately 23% of Unitrin's outstanding shares. Unitrin's certificate of incorporation already included a "shark-repellent" [19] provision barring any business combination with a more–than–15% stockholder unless approved by a majority of continuing directors or by a 75% stockholder vote ("Supermajority Vote"). Unitrin's shareholder directors announced publicly that they would not participate in the Repurchase Program and that this would

---

18. We note that the directors' failure to carry their initial burden under *Unocal* does not, *ipso facto,* invalidate the board's actions. Instead, once the Court of Chancery finds the business judgment rule does not apply, the burden remains on the directors to prove "entire fairness." *See Cede & Co. v. Technicolor, Inc.,* Del.Supr., 634 A.2d 345, 361 (1993); *Grobow v. Perot,* Del. Supr., 539 A.2d 180, 187 (1988) (*citing Aronson v. Lewis,* Del.Supr., 473 A.2d 805, 812–17

(1984)); *Shamrock Holdings, Inc. v. Polaroid Corp.,* Del.Ch., 559 A.2d 257, 271 (1989).

19. A "shark-repellent" is a provision in a company's by-laws or articles of incorporation that is intended to deter a bidder's interest in that company as a target for a takeover. *See* Ellen S. Friedenberg, *Jaws III: The Impropriety of Shark–Repellent Amendments as a Takeover Defense,* 7 Del.J.Corp.L. 32 (1982).

result in a percentage increase of ownership for them, as well as for any other shareholder who did not participate.

The Court of Chancery found that by not participating in the Repurchase Program, the Board "expected to create a 28% voting block to support the Board's decision to reject [a future] offer by American General."[20] From this underlying factual finding, the Court of Chancery concluded that American General might be "chilled" in its pursuit of Unitrin:

> Increasing the board members' percentage of stock ownership, combined with the supermajority merger provision, does more than protect uninformed stockholders from an inadequate offer, it chills any unsolicited acquiror from making an offer.

The parties are in substantial disagreement with respect to the Court of Chancery's ultimate factual finding that the Repurchase Program was a disproportionate response under *Unocal*. Unitrin argues that American General or another potential acquiror can theoretically prevail in an effort to obtain control of Unitrin through a proxy contest. American General argues that the record supports the Court of Chancery's factual determination that the adoption of the Repurchase Program violated the principles of *Unocal*, even though American General acknowledges that the option of a proxy contest for obtaining control of Unitrin remained theoretically available. The stockholder-plaintiffs argue that even if it can be said, as a matter of law, that it is acceptable under certain circumstances to leave potential bidders with a proxy battle as the sole avenue for acquiring an entity, the Court of Chancery correctly determined, as a factual matter, that the Repurchase Program was disproportionate to the threat American General's Offer posed.

### Proportionality Test

### Shareholder Franchise

This Court has been and remains assiduous in its concern about defensive actions designed to thwart the essence of corporate democracy by disenfranchising shareholders. *Paramount Communications, Inc. v. QVC Network, Inc.*, Del.Supr., 637 A.2d 34, 42 n. 11 (1994). *See also Stroud v. Grace*, Del. Supr., 606 A.2d 75 (1992). For example, when this Court concluded that rescheduling an annual meeting date directly manifested an entrenchment motive on the part of a board, we stated:

> [M]anagement has attempted to utilize the corporate machinery and the Delaware Law for the purpose of perpetuating itself in office; and, to that end, for the purpose of obstructing the legitimate efforts of dissident stockholders in the exercise of their rights to undertake a proxy contest against management. These are inequitable purposes, contrary to established principles of corporate democracy.

*Schnell v. Chris–Craft Indus., Inc.*, Del. Supr., 285 A.2d 437, 439 (1971). *See also Paramount Communications, Inc. v. QVC Network, Inc.*, 637 A.2d at 42 n. 11.

■ Nevertheless, this Court has upheld the propriety of adopting poison pills in given defensive circumstances. Keeping a poison pill in place may be inappropriate, however, when those circumstances change dramatically. *See Moran v. Household Int'l, Inc.*, Del. Supr., 500 A.2d 1346, 1355 (1985). *Cf. Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, Del.Supr., 506 A.2d 173, 179 (1986). Similarly, this Court has recognized the propriety of implementing certain repurchase programs (as in *Unocal* itself), as well as the unreasonableness and non-proportionality of responding defensively to a takeover bid with a coercive and preclusive partial self-tender offer. *See Paramount Communications, Inc. v. Time, Inc.*, Del.Supr., 571 A.2d 1140, 1154 (1990) (*citing AC Acquisitions Corp. v. Anderson, Clayton & Co.*, Del.Ch., 519 A.2d 103 (1986)).

More recently, this Court stated: "we accept the basic legal tenets," set forth in

---

**20.** American General submits that Morgan Stanley notes produced in response to an order compelling document production support the Court of Chancery's finding that the Repurchase Program had an antitakeover purpose:
  Ideals to get out to the public

- Antitrust
- Vigorous defense
- 23% insider holdings relative to 75% supermajority vote to effectuate a merger vote
- pill and by-laws.

*Blasius Indus., Inc. v. Atlas Corp.*, Del.Ch., 564 A.2d 651 (1988),[21] that "[w]here boards of directors deliberately employ[ ] ... legal strategies either to frustrate or completely disenfranchise a shareholder vote, ... [t]here can be no dispute that such conduct violates Delaware law." *Stroud v. Grace*, 606 A.2d at 91. In *Stroud*, we concluded, however, that a *Blasius* analysis was inappropriate. We reached that conclusion because it could not be said "that the 'primary purpose' of the board's action was to interfere with or impede exercise of the shareholder franchise," and because the shareholders had a "full and fair opportunity to vote." *Stroud v. Grace*, 606 A.2d at 92.

This Court also specifically noted that boards of directors often interfere with the exercise of shareholder voting when an acquiror *launches both a proxy fight and a tender offer. Id.* at 92 n. 3.[22] We then stated that such action "necessarily invoked both *Unocal* and *Blasius*" because "both [tests] recognize the inherent conflicts of interest that arise when shareholders are not permitted free exercise of their franchise." *Id.* Consequently, we concluded that, "[i]n certain circumstances, [the judiciary] must recognize the special import of protecting the shareholders' franchise within *Unocal's* requirement that any defensive measure be proportionate and 'reasonable in relation to the threat posed.' " *Id.* (citation omitted).[23]

### Takeover Strategy

### Tender Offer/Proxy Contest

We begin our examination of Unitrin's Repurchase Program mindful of the special im-

port of protecting the shareholder's franchise within *Unocal's* requirement that a defensive response be reasonable and proportionate. *Stroud v. Grace*, 606 A.2d at 92. For many years the "favored attack of a [corporate] raider was stock acquisition followed by a proxy contest." *Unocal*, 493 A.2d at 957. Some commentators have noted that the recent trend toward tender offers as the preferable alternative to proxy contests appears to be reversing because of the proliferation of sophisticated takeover defenses. Lucian A. Bebchuk & Marcel Kahan, *A Framework for Analyzing Legal Policy Towards Proxy Contests*, 78 Cal.L.Rev. 1071, 1134 (1990). In fact, the same commentators have characterized a return to proxy contests as "the only alternative to hostile takeovers to gain control against the will of the incumbent directors." *Id.*[24]

■ The Court of Chancery, in the case *sub judice*, was obviously cognizant that the emergence of the "poison pill" as an effective takeover device has resulted in such a remarkable transformation in the market for corporate control that hostile bidders who proceed when such defenses are in place will usually "have to couple proxy contests with tender offers." Joseph A. Grundfest, *Just Vote No: A Minimalist Strategy for Dealing with Barbarians Inside the Gates*, 45 Stan. L.Rev. 857, 858 (1993).[25] The Court of Chancery concluded that Unitrin's adoption of a poison pill was a proportionate response to the threat its Board reasonably perceived from American General's Offer. Nonetheless, the Court of Chancery enjoined the

---

21. In *Blasius*, the Court of Chancery held that board actions done primarily for the purpose of impeding the exercise of stockholder voting power are not invalid *per se*. "Rather, ... in such a case, the board bears the heavy burden of demonstrating a compelling justification for such action." *Blasius Indus., Inc. v. Atlas Corp.*, Del. Ch., 564 A.2d 651, 661 (1988). *See also* Robert J. Klein, *The Case for Heightened Scrutiny in Defense of the Shareholders' Franchise Right*, 44 Stan.L.Rev. 129 (1991).

22. *See* Randall S. Thomas, *Judicial Review of Defensive Tactics in Proxy Contests: When is Using a Rights Plan Right?* 46 Vand.L.Rev. 503 (1993).

23. *See also* Marcel Kahan, *Paramount or Paradox: The Delaware Supreme Court's Takeover Jurisprudence*, 19 J.Corp.L. 583 (1994).

24. "Proxy fights (including consent solicitations) have become a critical weapon of raiders who rely on them as an accessory to, and means of facilitating, a tender offer." 1 Arthur Fleischer, Jr., et al., *Takeover Defenses* X.C. at 653 (4th ed. 1990).

25. Another legal scholar states that, as a defensive tactic, the poison pill "warrants special attention chiefly because its preclusive effect frequently exceeds that of other takeover defensive tactics.... [and] make it effective even in cir-

additional defense of the Repurchase Program as disproportionate and "unnecessary."

The record reflects that the Court of Chancery's decision to enjoin the Repurchase Program is attributable to a continuing misunderstanding, i.e., that in conjunction with the longstanding Supermajority Vote provision in the Unitrin charter, the Repurchase Program would operate to provide the director shareholders with a "veto" to preclude a successful proxy contest by American General.[26] The origins of that misunderstanding are three premises that are each without record support. Two of those premises are objective misconceptions and the other is subjective.

### Directors' Motives

### "Prestige and Perquisites"

### Subjective Determination

The subjective premise was the Court of Chancery's *sua sponte* determination that Unitrin's outside directors, who are also substantial stockholders, would not vote like other stockholders in a proxy contest, *i.e.*, in their own best economic interests. At American General's Offer price, the outside directors held Unitrin shares worth more than $450 million. Consequently, Unitrin argues

the stockholder directors had the same interest as other Unitrin stockholders generally, when voting in a proxy contest, to wit: the maximization of the value of their investments.

In rejecting Unitrin's argument, the Court of Chancery stated that the stockholder directors would be "subconsciously" motivated in a proxy contest to vote against otherwise excellent offers which did not include a "price parameter" to compensate them for the loss of the "prestige and perquisites" of membership on Unitrin's Board. The Court of Chancery's subjective determination that the *stockholder directors* of Unitrin would reject an "excellent offer," unless it compensated them for giving up the "prestige and perquisites" of directorship, appears to be subjective and without record support. It cannot be presumed.

■ It must be the subject of proof that the Unitrin directors' objective in the Repurchase Program was to forego the opportunity to sell their stock at a premium. In particular, it cannot be presumed that the prestige and perquisites of holding a director's office or a motive to strengthen collective power prevails over a stockholder-director's economic interest. Even the shareholder-plaintiffs in this case agree with the legal proposition Unitrin advocates on appeal: stockhold-

---

cumstances where other defensive tactics may not work." Jeffrey N. Gordon, *Corporations, Markets, and Courts*, 91 Colum.L.Rev. 1931, 1946 (1991). *See also* Randall S. Thomas, *Judicial Review of Defensive Tactics in Proxy Contests: When is Using a Rights Plan Right?* 46 Vand. L.Rev. 503 (1993).

**26.** In reaching this result, the Court of Chancery described what it perceived to be the effect of the directors' increased percentage of stock ownership resulting from the Repurchase Program. The opinion of the Court of Chancery, as originally issued, stated:

> [I]t seems highly improbable that American General (or any other bidder) would view a proxy contest as a rational alternative once the repurchase program is completed. The repurchase program further reduces American General's incentive to undertake a proxy contest because a successful election will not provide American General with the power to combine the two companies. American General's di-

rectors will then control the company, but they still cannot implement a merger agreement without the consent of the former director stockholders.

The day after the original opinion was issued, American General's counsel wrote to the Court of Chancery to inform it of a factual error. According to American General's counsel, the original opinion was:

> technically not correct. If American General were to pursue and succeed in such a proxy contest when it owned less than 15% of Unitrin's stock, which, as the Court noted, are unrealistic assumptions, and the American General directors were then to approve a merger proposal, the supermajority provision would not apply.

The Court of Chancery acknowledged its mistake by sending out two corrected pages. Even with the two revised pages, the Court of Chancery's decision continues to reflect its initial misunderstanding of the Supermajority Vote provision.

ers are presumed to act in their own best economic interests when they vote in a proxy contest.

holder participation below 100%. *See Berlin v. Emerald Partners,* Del.Supr., 552 A.2d 482 (1989).[28]

### *Without Repurchase Program*

#### *Actual Voting Power Exceeds 25%*

The first objective premise relied upon by the Court of Chancery, unsupported by the record, is that the shareholder directors needed to implement the Repurchase Program to attain voting power in a proxy contest equal to 25%. The Court of Chancery properly calculated that if the Repurchase Program was completed, Unitrin's shareholder directors would increase their absolute voting power to 25%. It then calculated the odds of American General marshalling enough votes to defeat the Board and its supporters.[27]

The Court of Chancery and all parties agree that proxy contests do not generate 100% shareholder participation. The shareholder plaintiffs argue that 80–85% may be a usual turnout. Therefore, *without* the Repurchase Program, the director shareholders' absolute voting power of 23% would already constitute *actual voting power greater than 25%* in a proxy contest with normal share-

### *Supermajority Vote*

#### *No Realistic Deterrent*

The second objective premise relied upon by the Court of Chancery, unsupported by the record, is that American General's ability to succeed in a proxy contest depended on the Repurchase Program being enjoined because of the Supermajority Vote provision in Unitrin's charter.[29] Without the approval of a target's board, the danger of activating a poison pill renders it irrational for bidders to pursue stock acquisitions above the triggering level.[30] Instead, "bidders intent on working around a poison pill must launch and win proxy contests to elect new directors who are willing to redeem the target's poison pill." Joseph A. Grundfest, *Just Vote No: A Minimalist Strategy for Dealing with Barbarians Inside the Gates,* 45 Stan.L.Rev. 857, 859 (1993).

As American General acknowledges, a less than 15% stockholder bidder need not proceed with acquiring shares to the extent that it would ever implicate the Supermajority

---

**27.** The parties acknowledge that the Court of Chancery's calculation was mistaken but apparently agree on appeal that assuming there is a 90% voter turn-out, to succeed a 14.9% bidder would have to outpoll the shareholder directors either 1.36 to 1 or 1.76 to 1 in an election for directors and either 2 to 1 or 3 to 1 in a subsequent merger vote. This opinion's discussion regarding the fact that 42% of Unitrin's stock was owned by institutional investors makes the probative weight of even the correct polling comparisons *de minimis.*

**28.** *See also* Jay M. Zitter, Annotation, *Validity, Construction, and Effect of Provision in Charter or Bylaw Requiring Supermajority Vote,* 80 A.L.R.4th 667 (1990).

**29.** *Cf. UIS, Inc. v. Walbro Corp.,* Del.Ch., C.A. No. 9323 (Oct. 6, 1987), 13 Del.J.Corp.L. 806, 1987 WL 18108 (1988). In *UIS,* the Court of Chancery granted an order sought by the tender offeror to temporarily restrain the target from purchasing its own shares. That offer was conditioned on the tender of all but 4% of the shares not already controlled by the offeror or the di-

rectors and officers of the target or persons allied with them. The Court of Chancery calculated that if the target were permitted to go into the market and buy up an additional 8% of its shares, as it planned to do, it would be mathematically impossible for the tender offeror to achieve its goal.

**30.** The ... flip-in and flip-over features [of a poison pill] stop individual shareholders or shareholder groups from accumulating large amounts of the target company's stock. No potential acquiror or other shareholder will risk triggering a [poison pill] by accumulating more than the threshold level of shares because of the threat of massive discriminatory dilution. The trigger level therefore effectively sets a ceiling on the amount of stock that any shareholder can accumulate before launching a proxy contest.
Randall S. Thomas, *Judicial Review of Defensive Tactics in Proxy Contests: When is Using a Rights Plan Right?,* 46 Vand.L.Rev. 503, 512 (1993).

Vote provision. In fact, it would be illogical for American General or any other bidder to acquire more than 15% of Unitrin's stock because that would not only trigger the poison pill, but also the constraints of 8 *Del.C.* § 203. If American General were to initiate a proxy contest *before* acquiring 15% of Unitrin's stock, it would need to amass only 45.1% of the votes assuming a 90% voter turnout. If it commenced a tender offer at an attractive price contemporaneously with its proxy contest, it could seek to acquire 50.1% of the outstanding voting stock.

The record reflects that institutional investors own 42% of Unitrin's shares. Twenty institutions own 33% of Unitrin's shares. It is generally accepted that proxy contests have re-emerged with renewed significance as a method of acquiring corporate control because "the growth in institutional investment has reduced the dispersion of share ownership." Lucian A. Bebchuk & Marcel Kahan, *A Framework for Analyzing Legal Policy Towards Proxy Contests,* 78 Cal. L.Rev. 1071, 1134 (1990).[31] "Institutions are more likely than other shareholders to vote at all, more likely to vote against manager proposals, and more likely to vote for proposals by other shareholders." Bernard S. Black, *The Value of Institutional Investor Monitoring: The Empirical Evidence,* 39 UCLA L.Rev. 895, 925 (1992). *See also* John Pound, *Shareholder Activism and Share Values: The Causes and Consequences of Countersolicitations Against Management Antitakeover Proposals,* 32 J.L. & Econ. 357, 368 (1989).[32]

*With Supermajority Vote*

*After Repurchase Program*

*Proxy Contest Appears Viable*

The assumptions and conclusions American General sets forth in this appeal for a differ-

ent purpose are particularly probative with regard to the effect of the institutional holdings in Unitrin's stock. American General's two predicate assumptions are a 90% stockholder turnout in a proxy contest and a bidder with 14.9% holdings, i.e., the maximum the bidder could own to avoid triggering the poison pill and the Supermajority Vote provision. American General also calculated the votes available to the Board or the bidder with and without the Repurchase Program:

Assuming no Repurchase [Program], the [shareholder directors] would hold 23%, the percentage collectively held by the [directors] and the bidder would be 37.9%, and the percentage of additional votes available to either side would be 52.1%.

Assuming the Repurchase [Program] is fully consummated, the [shareholder directors] would hold 28%, the percentage collectively held by the bidder and the [directors] would be 42.9%, and the percentage of additional votes available to either side would be 47.1%.

■ American General then applied these assumptions to reach conclusions regarding the votes needed for the 14.9% stockholder bidder to prevail: first, in an election of directors; and second, in the subsequent vote on a merger. With regard to the election of directors, American General made the following calculations:

Assume 90% stockholder turnout. To elect directors, a plurality must be obtained; assuming no abstentions and only two competing slates, one must obtain the votes of 45.1% of the shares.

The percentage of additional votes the bidder needs to win is: 45.1% − 14.9% (maximum the bidder could own and avoid the poison pill, § 203 and supermajority) = 30.2%.

---

**31.** Professor Grundfest has marshalled references to the literature discussing collective action problems for shareholder activity. Joseph A. Grundfest, *Just Vote No: A Minimalist Strategy for Dealing with Barbarians Inside the Gates,* 45 Stan.L.Rev. 857, 908 n. 226 (1993).

**32.** *See, generally,* Mark J. Roe, *A Political Theory of American Corporate Finance,* 91 Colum.L.Rev.

10 (1991). *See also* John C. Coffee, Jr., *Liquidity Versus Control: The Institutional Investor as Corporate Monitor,* 91 Colum.L.Rev. 1277 (1991); *cf.* Bernard S. Black, *Agents Watching Agents: The Promise of Institutional Investor Voice,* 39 UCLA L.Rev. 811 (1992).

A merger requires approval of a majority of outstanding shares, 8 *Del.C.* § 251, not just a plurality. In that regard, American General made the following calculations:

Assume 90% stockholder turnout. To approve a merger, one must obtain the favorable vote of 50.1% of the shares.

The percentage of additional votes the bidder needs to win is 50.1% − 14.9% = 35.2%.

Consequently, to prevail in a proxy contest with a 90% turnout, the percentage of additional shareholder votes a 14.9% shareholder bidder needs to prevail is 30.2% for directors and 35.2% in a subsequent merger. The record reflects that institutional investors held 42% of Unitrin's stock and 20 institutions held 33% of the stock. Thus, American General's own assumptions and calculations in the record support the Unitrin Board's argument that "it is hard to imagine a company more readily susceptible to a proxy contest concerning a pure issue of dollars." [33]

The conclusion of the Court of Chancery that the Repurchase Program would make a proxy contest for Unitrin a "theoretical" possibility that American General could not realistically pursue may be erroneous and appears to be inconsistent with its own earlier determination that the "repurchase program strengthens the position of the Board of Directors to defend against a hostile bidder, but will not deprive the public stockholders of the 'power to influence corporate direction through the ballot.'" Even a complete implementation of the Repurchase Program, in combination with the pre-existing Supermajority Vote provision, would not appear to have a preclusive effect upon American General's ability successfully to marshall enough shareholder votes to win a proxy contest. *Accord Shamrock Holdings, Inc. v. Polaroid Corp.*, Del.Ch., 559 A.2d 278 (1989). A proper understanding of the record reflects that American General or any other 14.9% shareholder bidder could apparently win a proxy contest with a 90% turnout.

The key variable in a proxy contest would be the merit of American General's issues, not the size of its stockholdings. *Moran v. Household Int'l, Inc.*, Del.Supr., 500 A.2d 1346, 1355 (1985). If American General presented an attractive price as the cornerstone of a proxy contest, it could prevail, irrespective of whether the shareholder directors' absolute voting power was 23% or 28%. In that regard, the following passage from the Court of Chancery's Opinion is poignant:

Harold Hook, the Chairman of American General, admitted in his deposition that the repurchase program is not a "show stopper" because the directors that own stock will act in their own best interest if the price is high enough. (Hook Dep. at 86–87). Fayez Sarofim, one of the Unitrin directors that holds a substantial number of shares, testified that 'everything has a price parameter.'"

Consequently, a proxy contest apparently remained a viable alternative for American General to pursue notwithstanding Unitrin's poison pill, Supermajority Vote provision, and a fully implemented Repurchase Program.

*Substantive Coercion*

*American General's Threat*

■■■■■ This Court has recognized "the prerogative of a board of directors to resist a third party's unsolicited acquisition proposal or offer." *Paramount Communications, Inc. v. QVC Network, Inc.*, Del.Supr., 637 A.2d 34, 43 n. 13 (1994). The Unitrin Board did not have unlimited discretion to defeat the threat it perceived from the American General Offer by any draconian [34] means available. *See Unocal*, 493 A.2d at 955.

---

33. That institutions held a high percentage of Unitrin's stock is not as significant as the fact that the relatively concentrated percentage of stockholdings would facilitate a bidder's ability to communicate the merits of its position.

34. **Draconian,** adj. Of or pert. to Draco, an archon and member of the Athenian eupatridae, or the code of laws which is said to have been framed about 621 B.C. by him as thesmothete. In them the penalty for most offenses was death,

Pursuant to the *Unocal* proportionality test, the nature of the threat associated with a particular hostile offer sets the parameters for the range of permissible defensive tactics. Accordingly, the purpose of enhanced judicial scrutiny is to determine whether the Board acted reasonably in "relation ... to the threat which a particular bid allegedly poses to stockholder interests." *Mills Acquisition Co. v. Macmillan, Inc.,* Del.Supr., 559 A.2d 1261, 1288 (1989).

"The obvious requisite to determining the reasonableness of a defensive action is a clear identification of the nature of the threat." *Paramount Communications, Inc. v. Time, Inc.,* Del.Supr., 571 A.2d 1140, 1154 (1990). Courts, commentators and litigators have attempted to catalogue the threats posed by hostile tender offers. *Id.* at 1153. Commentators have categorized three types of threats:

(i) *opportunity loss* ... [where] a hostile offer might deprive target shareholders of the opportunity to select a superior alternative offered by target management [or, we would add, offered by another bidder]; (ii) *structural coercion,* ... the risk that disparate treatment of non-tendering shareholders might distort shareholders' tender decisions; and (iii) *substantive coercion,* ... the risk that shareholders will mistakenly accept an underpriced offer because they disbelieve management's representations of intrinsic value.

*Id.* at 1153 n. 17 (*quoting* Ronald J. Gilson & Reinier Kraakman, *Delaware's Intermediate Standard for Defensive Tactics: Is There Substance to Proportionality Review?,* 44 Bus.Law. 247, 267 (1989)).

This Court has held that the "inadequate value" of an all cash for all shares offer is a "legally cognizable threat." *Paramount Communications, Inc. v. Time, Inc.,* 571 A.2d at 1153. In addition, this Court has specifically concluded that inadequacy of value is *not* the *only* legally cognizable threat from "an all-shares, all-cash offer at a price

below what a target board in good faith deems to be the present value of its shares." *Id.* at 1152–53. In making that determination, this Court held that the Time board of directors had reasonably determined that inadequate value was not the only threat that Paramount's all cash for all shares offer presented, but was *also* reasonably concerned that the Time stockholders might tender to Paramount in ignorance or based upon a mistaken belief, *i.e.,* yield to substantive coercion.

■ The record reflects that the Unitrin Board perceived the threat from American General's Offer to be a form of substantive coercion. The Board noted that Unitrin's stock price had moved up, on higher than normal trading volume, to a level slightly below the price in American General's Offer. The Board also noted that some Unitrin shareholders had publicly expressed interest in selling at or near the price in the Offer. The Board determined that Unitrin's stock was undervalued by the market at current levels and that the Board considered Unitrin's stock to be a good long-term investment. The Board also discussed the speculative and unsettled market conditions for Unitrin stock caused by American General's public disclosure. The Board concluded that a Repurchase Program would provide additional liquidity to those stockholders who wished to realize short-term gain, and would provide enhanced value to those stockholders who wished to maintain a long-term investment. Accordingly, the Board voted to authorize the Repurchase Program for up to ten million shares of its outstanding stock on the open market.

In *Unocal,* this Court noted that, pursuant to Delaware corporate law, a board of directors' duty of care required it to respond actively to protect the corporation and its shareholders from perceived harm. *Unocal,* 493 A.2d at 955. In *Unocal,* when describing the proportionality test, this Court listed several examples of concerns that boards of

and to a later age they seemed so severe that they were said to be written in blood. Hence, barba-

rously severe; harsh; cruel. *Webster's New International Dictionary* 780 (2d ed. 1951).

directors should consider in evaluating and responding to perceived threats. Unitrin's Board deemed three of the concerns exemplified in *Unocal* relevant in deciding to authorize the Repurchase Program: first, the inadequacy of the price offered; second, the nature and timing of American General's Offer; and third, the basic stockholder interests at stake, including those of short-term speculators whose actions may have fueled the coercive aspect of the Offer at the expense of the long-term investor. *Unocal,* 493 A.2d at 955–56. *Accord Ivanhoe Partners v. Newmont Mining Corp.,* Del.Supr., 535 A.2d 1334, 1341–42 (1987).

The record appears to support Unitrin's argument that the Board's justification for adopting the Repurchase Program was its reasonably perceived risk of substantive coercion, *i.e.,* that Unitrin's shareholders might accept American General's inadequate Offer because of "ignorance or mistaken belief" regarding the Board's assessment of the long-term value of Unitrin's stock. *See Shamrock Holdings, Inc. v. Polaroid Corp.,* Del.Ch., 559 A.2d 278, 290 (1989). In this case, the Unitrin Board's letter to its shareholders specifically reflected those concerns in describing its perception of the threat from American General's Offer. The adoption of the Repurchase Program also appears to be consistent with this Court's holding that economic inadequacy is not the only threat presented by an all cash for all shares hostile bid, because the threat of such a hostile bid could be exacerbated by shareholder "ignorance or ... mistaken belief." *Paramount Communications, Inc. v. Time, Inc.,* 571 A.2d at 1153.

### Range of Reasonableness

#### Proper Proportionality Burden

▬▬▬ The Court of Chancery's legal conclusions are subject to *de novo* review by this Court. *Merrill v. Crothall–American, Inc.,* Del.Supr., 606 A.2d 96, 99 (1992). The Court of Chancery's factual findings will be accepted if "they are sufficiently supported by the record and are the product of an orderly and logical deductive process." *Levitt v. Bouvier,* Del.Supr., 287 A.2d 671, 673 (1972).

We have already noted that the Court of Chancery made a factual finding unsupported by the record, *i.e.,* that the increase in the percentage of ownership by the stockholder directors from 23% to 28%, resulting from the completed Repurchase Program, would make it merely theoretically possible for an insurgent to win a proxy contest. That finding was based upon a hypothetical risk which originated from the Court of Chancery's attribution of subjective "prestige and perquisite" voting motives to Unitrin's outside shareholder directors. *See Stroud v. Grace,* Del.Supr., 606 A.2d 75, 82 (1992). In addition, that factual finding was based upon two objective mathematically erroneous calculations regarding the relative voting strength of American General and the stockholder directors.

The Court of Chancery applied an incorrect legal standard when it ruled that the Unitrin decision to authorize the Repurchase Program was disproportionate because it was "unnecessary." The Court of Chancery stated:

> Given that the Board had already implemented the poison pill and the advance notice provision, the repurchase program was unnecessary to protect Unitrin from an inadequate bid.

In *QVC,* this Court recently elaborated upon the judicial function in applying enhanced scrutiny, citing *Unocal* as authority, albeit in the context of a sale of control and the target board's consideration of one of several reasonable alternatives. That teaching is nevertheless applicable here:

> a court applying enhanced judicial scrutiny should be deciding whether the directors made *a reasonable* decision, not *a perfect* decision. If a board selected one of several reasonable alternatives, a court should not second guess that choice even though it might have decided otherwise or subsequent events may have cast doubt on the

board's determination. Thus, courts will not substitute their business judgment for that of the directors, but will determine if the directors' decision was, on balance, within a range of reasonableness. *See Unocal*, 493 A.2d at 955–56; *Macmillan*, 559 A.2d at 1288; *Nixon*, 626 A.2d at 1378.

*Paramount Communications, Inc. v. QVC Network, Inc.*, Del.Supr., 637 A.2d 34, 45–46 (1994) (emphasis in original). The Court of Chancery did not determine whether the Unitrin Board's decision to implement the Repurchase Program fell within a "range of reasonableness."

The record reflects that the Unitrin Board's adoption of the Repurchase Program was an apparent recognition on its part that all shareholders are not alike.[35] This Court has stated that distinctions among types of shareholders are neither inappropriate nor irrelevant for a board of directors to make, *e.g.*, distinctions between long-term shareholders and short-term profit-takers, such as arbitrageurs, and their stockholding objectives. *Id.* In *Unocal* itself, we expressly acknowledged that "a board may reasonably consider the basic stockholder interests at stake, including those of short term speculators, whose actions may have fueled the coercive aspect of the offer at the expense of the long term investor." *Unocal*, 493 A.2d at 955–56. *See also Ivanhoe Partners v. Newmont Mining Corp.*, Del.Supr., 535 A.2d 1334, 1341–42 (1987).

The Court of Chancery's determination that the Unitrin Board's adoption of the Repurchase Program was unnecessary constituted a substitution of its business judgment

for that of the Board, contrary to this Court's "range of reasonableness" holding in *Paramount Communications, Inc. v. QVC Network, Inc.*, 637 A.2d at 45–46. Its decision to enjoin the Repurchase Program as an "unnecessary" *addition* to other complementary defensive mechanisms is also inconsistent with a similar analysis in *Shamrock Holdings, Inc. v. Polaroid Corp.*, Del.Ch., 559 A.2d 278 (1989). In *Shamrock*, the Court of Chancery refused to enjoin any one of a series of transactions which included a repurchase plan. With respect to a repurchase program, the Court of Chancery held that a self-tender offer and buy-back plan constituted a reasonable proportionate response to the perceived threat to Polaroid shareholders by offering "some immediate value to those holders interested in cash while increasing the equity interest held by the remaining stockholders." *Shamrock Holdings, Inc. v. Polaroid Corp.*, 559 A.2d at 290.[36] Although *Shamrock* dealt with an offer that did not reflect the very profitable litigation embodied in the Kodak patent case settlement and therefore implicated a potentially more serious threat than that involved here, *Shamrock* is nevertheless applicable considering American General's negotiable "low-ball" bid.

*Draconian Defenses*

*Coercive or Preclusive*

*Range of Reasonableness*

■ In assessing a challenge to defensive actions by a target corporation's board of directors in a takeover context, this Court has held that the Court of Chancery should

---

**35.** *See* Harvey L. Pitt, *On the Precipice: A Reexamination of Directors' Fiduciary Duties in the Context of Hostile Acquisitions*, 15 Del.J.Corp.L., 811, 826–27 (1990).

**36.** Similarly, in *Samjens Partners I v. Burlington Industries, Inc.*, 663 F.Supp. 614 (S.D.N.Y.1987), a federal court applying Delaware law upheld Burlington Industries' self-tender offer for 25% of its common stock at a price of $80 per share. The self-tender offer was commenced in response to a tender offer Burlington's board believed was inadequate. The self-tender offer, in Burlington's words, was intended:

to preserve the flexibility of the Company while ... alternatives are being explored, to avoid any significant time delay in shareholders realizing the benefit of any ... restructuring and to give shareholders desiring to receive cash for a portion of their shares an alternative to the inadequate Samjens Tender Offer, while permitting them to retain at the present time a continuing interest in the Company.

*Id.* at 619.

evaluate the board's overall response, including the justification for each contested defensive measure, and the results achieved thereby. Where all of the target board's defensive actions are inextricably related, the principles of *Unocal* require that such actions be scrutinized collectively as a unitary response to the perceived threat. *Gilbert v. El Paso Co.*, Del.Supr., 575 A.2d 1131, 1145 (1990). Thus, the Unitrin Board's adoption of the Repurchase Program, in addition to the poison pill, must withstand *Unocal*'s proportionality review. *Id.*

In *Unocal*, the progenitor of the proportionality test, this Court stated that the board of directors' "duty of care extends to protecting the corporation and its [stockholders] from perceived harm whether a threat originates from third parties or other shareholders." *Unocal*, 493 A.2d at 955. We then noted that "such powers are not absolute." *Id.* Specifically, this Court held that the board "does not have unbridled discretion to defeat any perceived threat by any Draconian means available." *Id.* Immediately following those observations in *Unocal*, when exemplifying the parameters of a board's authority in adopting a restrictive stock repurchase, this Court held that "the directors may not have acted *solely* or *primarily* out of a desire to perpetuate themselves in office" (preclusion of the stockholders' corporate franchise right to vote) and, further, that the stock repurchase plan must not be inequitable. *Unocal*, 493 A.2d at 955 (emphasis added).[37]

An examination of the cases applying *Unocal* reveals a direct correlation between findings of proportionality or disproportionality and the judicial determination of whether a defensive response was draconian because it was either coercive or preclusive in character. In *Time*, for example, this Court concluded that the Time board's defensive response was reasonable and proportionate since it was not aimed at "cramming down" on its shareholders a management-sponsored

alternative, *i.e.*, was not coercive, and because it did not preclude Paramount from making an offer for the combined Time–Warner company, *i.e.*, was not preclusive. *See Paramount Communications, Inc. v. Time, Inc.*, Del.Supr., 571 A.2d 1140, 1154–55 (1990) (citing for comparison as coercive or preclusive disproportionate responses *Mills Acquisition Co. v. Macmillan, Inc.*, Del. Supr., 559 A.2d 1261 (1989), and *AC Acquisitions Corp. v. Anderson, Clayton & Co.*, Del. Ch., 519 A.2d 103 (1986)).

This Court also applied *Unocal's* proportionality test to the board's adoption of a "poison pill" shareholders' rights plan in *Moran v. Household Int'l, Inc.*, Del.Supr., 500 A.2d 1346 (1985). After acknowledging that the adoption of the rights plan was within the directors' statutory authority, this Court determined that the implementation of the rights plan was a proportionate response to the theoretical threat of a hostile takeover, in part, because it did not "strip" the stockholders of their right to receive tender offers *and* did not fundamentally restrict proxy contests, *i.e.*, was not preclusive. *Id.* at 1357.

■ More than a century before *Unocal* was decided, Justice Holmes observed that the common law must be developed through its application and "cannot be dealt with as if it contained only the axioms and corollaries of a book of mathematics." Oliver Wendell Holmes, Jr., *The Common Law* 1 (1881). As common law applications of *Unocal's* proportionality standard have evolved, at least two characteristics of draconian defensive measures taken by a board of directors in responding to a threat have been brought into focus through enhanced judicial scrutiny. In the modern takeover lexicon, it is now clear that since *Unocal*, this Court has consistently recognized that defensive measures which are either preclusive or coercive are included within the common law definition of draconian.

■ If a defensive measure is not draconian, however, because it is not either coer-

---

37. *Unocal* also involved a stock repurchase. In *Unocal*, this Court ultimately held that the selective exchange offer was consistent with the

board's duty and proportionately related to the threat posed. *Unocal*, 493 A.2d at 956–57.

cive or preclusive, the *Unocal* proportionality test requires the focus of enhanced judicial scrutiny to shift to "the range of reasonableness." *Paramount Communications, Inc. v. QVC Network, Inc.*, Del.Supr., 637 A.2d 34, 45–46 (1994). Proper and proportionate defensive responses are intended and permitted to thwart perceived threats. When a corporation is not for sale, the board of directors is the defender of the metaphorical medieval corporate bastion and the protector of the corporation's shareholders. The fact that a defensive action must not be coercive or preclusive does not prevent a board from responding defensively before a bidder is at the corporate bastion's gate.[38]

■ The *ratio decidendi* for the "range of reasonableness" standard is a need of the board of directors for latitude in discharging its fiduciary duties to the corporation and its shareholders when defending against perceived threats. The concomitant requirement is for judicial restraint. Consequently, if the board of directors' defensive response is not draconian (preclusive or coercive) and is within a "range of reasonableness," a court must not substitute its judgment for the board's. *Paramount Communications, Inc. v. QVC Network, Inc.*, 637 A.2d at 45–46.

*This Case*

*Repurchase Program*

*Proportionate With Poison Pill*

In this case, the initial focus of enhanced judicial scrutiny for proportionality requires a determination regarding the defensive re-

sponses by the Unitrin Board to American General's offer. We begin, therefore, by ascertaining whether the Repurchase Program, as an addition to the poison pill, was draconian by being either coercive or preclusive.

■ A limited nondiscriminatory self-tender, like some other defensive measures, may thwart a current hostile bid, but is not inherently coercive. Moreover, it does not necessarily preclude future bids or proxy contests by stockholders who decline to participate in the repurchase. *Cf. AC Acquisitions Corp. v. Anderson, Clayton & Co.*, Del. Ch., 519 A.2d 103 (1986) (enjoining a coercive self-tender and restructuring plan). A selective repurchase of shares in a public corporation on the market, such as Unitrin's Repurchase Program, generally does not discriminate because all shareholders can voluntarily realize the same benefit by selling. *See* Larry E. Ribstein, *Takeover Defenses and the Corporate Contract*, 78 Geo.L.J. 71, 129–31 (1989). *See also* Michael Bradley & Michael Rosenzweig, *Defensive Stock Repurchases*, 99 Harv.L.Rev. 1377 (1986). Here, there is no showing on this record that the Repurchase Program was coercive.

■ We have already determined that the record in this case appears to reflect that a proxy contest remained a viable (if more problematic) alternative for American General even if the Repurchase Program were to be completed in its entirety. Nevertheless, the Court of Chancery must determine whether Unitrin's Repurchase Program would only inhibit American General's ability to wage a proxy fight and institute a merger or whether it was, in fact, preclusive[39] be-

---

**38.** This Court's choice of the term draconian in *Unocal* was a recognition that the law affords boards of directors substantial latitude in defending the perimeter of the corporate bastion against perceived threats. Thus, continuing with the medieval metaphor, if a board reasonably perceives that a threat is on the horizon, it has broad authority to respond with a panoply of individual or combined defensive precautions, e.g., staffing the barbican, raising the drawbridge, and lowering the portcullis. Stated more directly, depending upon the circumstances, the board may respond to a reasonably perceived threat by adopting individually or sometimes in

combination: advance notice by-laws, supermajority voting provisions, shareholder rights plans, repurchase programs, etc.

**39.** The record in this case, when properly understood, appears to reflect that the Repurchase Program's effect on a proxy contest would not be preclusive. *Accord Moran v. Household Int'l, Inc.*, Del.Supr., 500 A.2d 1346, 1355 (1985). If the stockholders of Unitrin are "displeased with the action of their elected representatives, the powers of corporate democracy" remain available as a viable alternative to turn the Board out in a proxy contest. *Unocal*, 493 A.2d at 959.

cause American General's success would either be mathematically impossible or realistically unattainable. If the Court of Chancery concludes that the Unitrin Repurchase Program was not draconian because it was not preclusive, one question will remain to be answered in its proportionality review: whether the Repurchase Program was within a range of reasonableness?

The Court of Chancery found that the Unitrin Board reasonably believed that American General's Offer was inadequate and that the adoption of a poison pill was a proportionate defensive response. Upon remand, in applying the correct legal standard to the factual circumstances of this case, the Court of Chancery may conclude that the implementation of the limited Repurchase Program was also within a range of reasonable additional defensive responses available to the Unitrin Board. In considering whether the Repurchase Program was within a range of reasonableness the Court of Chancery should take into consideration whether: (1) it is a statutorily authorized form of business decision which a board of directors may routinely make in a non-takeover context;[40] (2) as a defensive response to American General's Offer it was limited and corresponded in degree or magnitude to the degree or magnitude of the threat, (*i.e.*, assuming the threat was relatively "mild," was the response relatively "mild?"); (3) with the Repurchase Program, the Unitrin Board properly recognized that all shareholders are not alike, and provided immediate liquidity to those shareholders who wanted it.[41]

The Court of Chancery's holding in *Shamrock*, cited with approval by this Court in *Time*,[42] appears to be persuasive support for the proportionality of the multiple defenses Unitrin's Board adopted. In *Shamrock*, the Court of Chancery concluded that the Polaroid board had "a valid basis for concern that

the Polaroid stockholders [like Unitrin's stockholders] will be unable to reach an accurate judgment as to the intrinsic value of their stock." *Shamrock Holdings, Inc. v. Polaroid Corp.*, 559 A.2d at 290. The Court of Chancery also observed, "the likely shift in the stockholder profile in favor of Polaroid" as a result of the repurchase plan "appears to be minimal." *Id.* Consequently, the Court of Chancery concluded that Polaroid's defensive response as a whole—the ESOP, the issuance of stock to a friendly third party and the stock repurchase plan—was not disproportionate to the Shamrock threat or improperly motivated, and "individually or collectively will [not] preclude the successful completion of Shamrock's tender offer." *Id.* at 288.

American General argues that the all cash for all shares offer in *Shamrock* is distinguishable because *Shamrock* involved a hostile tender offer, whereas this case involves a fully negotiable Offer to enter into a consensual merger transaction. Nevertheless, American General acknowledges that a determinative factor in *Shamrock* was a finding that the defensive responses had only an incidental effect on the stockholder profile for the purpose of a proxy contest, *i.e.*, was not preclusive. *See id.* at 286–288. In *Shamrock*, the Court of Chancery's proportionality holding was also an implicit determination that the series of multiple defensive responses were within a "range of reasonableness."

*Remand to Chancery*

In this case, the Court of Chancery erred by substituting its judgment, that the Repurchase Program was unnecessary, for that of the Board. The Unitrin Board had the power and the duty, upon reasonable investigation, to protect Unitrin's shareholders from what it perceived to be the threat

**40.** *See Unocal*, 493 A.2d at 958; *Cheff v. Mathes*, Del.Supr., 199 A.2d 548, 554 (1964).

**41.** *See Shamrock Holdings, Inc. v. Polaroid Corp.*, Del.Ch., 559 A.2d 278, 290–91 (1989); *Unocal*, 493 A.2d at 956; *Cf. Paramount Communica-*

*tions, Inc. v. Time, Inc.*, Del.Supr., 571 A.2d 1140, 1154 (1990).

**42.** *Paramount Communications, Inc. v. Time, Inc.*, Del.Supr., 571 A.2d 1140, 1155 n. 19 (1990).

from American General's inadequate all-cash for all-shares Offer. *Unocal*, 493 A.2d at 958. The adoption of the poison pill *and* the limited Repurchase Program was not coercive and the Repurchase Program may not be preclusive. Although each made a takeover more difficult, individually and collectively, if they were not coercive or preclusive the Court of Chancery must determine whether they were within the range of reasonable defensive measures available to the Board. *Accord Cheff v. Mathes*, Del.Supr., 199 A.2d 548, 554–56 (1964).

■ If the Court of Chancery concludes that individually and collectively the poison pill and the Repurchase Program were proportionate to the threat the Board believed American General posed, the Unitrin Board's adoption of the Repurchase Program and the poison pill is entitled to review under the traditional business judgment rule. The burden will then shift "back to the plaintiffs who have the ultimate burden of persuasion [in a preliminary injunction proceeding] to show a breach of the directors' fiduciary duties." *Moran v. Household Int'l, Inc.*, Del.Supr., 500 A.2d 1346, 1356 (1985) (*citing Unocal*, 493 A.2d at 958). In order to rebut the protection of the business judgment rule, the burden on the plaintiffs will be to demonstrate, "by a preponderance of the evidence that the directors' decisions were *primarily* based on [ (1) ] perpetuating themselves in office or [ (2) ] some other breach of fiduciary duty such as fraud, overreaching, lack of good faith, or [ (3) ] being uninformed." *Unocal*, 493 A.2d at 958 (emphasis added).

### American General's

### Alternative Argument

■ American General's alternative argument on appeal is that the preliminary injunction should be affirmed, notwithstanding the reversible error that has been identified in the Court of Chancery's *Unocal* analysis, based upon breaches by the Unitrin Board of its duties of care, loyalty and disclosure. *See A.I.D. v. P.M.D.*, Del.Supr., 408 A.2d 940, 942

(1979). We recognize that this Court may affirm on the basis of a different rationale than that which was articulated by the trial court. We also recognize that this Court may rule on an issue fairly presented to the trial court, even if it was not addressed by the trial court. *Standard Distrib. Co. v. Nally*, Del.Supr., 630 A.2d 640, 647 (1993).

■ Because of its erroneous determination under *Unocal*, the Court of Chancery did not reach American General's claims that the Unitrin defendants breached their duties of due care, disclosure and loyalty in connection with the adoption of the Repurchase Program. We have concluded that it would be inequitable to take the alternative course of action American General advocates in this expedited interlocutory appeal. The Court of Chancery should have the opportunity to address those alternative breach of duty arguments in the first instance.

### Equitable Remedy

### Preliminary Injunction

Unitrin's alternative argument is that the Court of Chancery should not have enjoined the Repurchase Program, even if it was not entirely persuaded that the Program's enactment was within a range of reasonableness. According to Unitrin, under such circumstances in the context of a preliminary injunction proceeding, the appropriate equitable remedy would have been to enjoin the defendants from exercising any increase in their voting power as shareholders that resulted from the Repurchase Program. Upon remand, it may be necessary for the Court of Chancery to address Unitrin's alternative argument.

■ After applying *Unocal's* proportionality test, the Court of Chancery may conclude that Unitrin's Repurchase Program was within the range of reasonableness. Nevertheless, this Court recognizes that in all preliminary injunction proceedings, after an application of *Unocal's* proportionality test, a bright line might not appear to delin-

eate that a repurchase program is clearly within the range of reasonableness, even if it is clearly not coercive or preclusive. In such an ambiguous factual circumstance, the Court of Chancery could properly conclude that a non-coercive and non-preclusive repurchase program should not be enjoined. Yet, in balancing the potential hardships to the parties, it has broad power to fashion an equitable remedy. Therefore, it might enter a preliminary injunction against the voting rights which would accrue to the defendants from the non-preclusive and non-coercive repurchase program, until such time as there has been a trial on the merits of the plaintiffs' complaint with regard to reasonableness.

## Conclusion

We hold that the Court of Chancery correctly determined that the *Unocal* standard of enhanced judicial scrutiny applied to the defensive actions of the Unitrin defendants in establishing the poison pill and implementing the Repurchase Program. The Court of Chancery's finding, that the Repurchase Program was a disproportionate defensive response, was based on faulty factual predicates, unsupported by the record. This error was exacerbated by its application of an erroneous legal standard of "necessity" to the Repurchase Program as a defensive response.

The interlocutory judgment of the Court of Chancery, in favor of American General, is REVERSED. This matter is REMANDED for further proceedings in accordance with this opinion. The mandate shall issue at 4:30 p.m. on January 16, 1995. Supr.Ct.R. 19(a).