STATE of Delaware, Plaintiff
Below, Appellant,

v.

Glen R. SLOMAN, Defendant
Below, Appellee.

No. 511,2004.

Supreme Court of Delaware.

Submitted: Oct. 19, 2005.
Decided: Nov. 4, 2005.

Paul R. Wallace, Department of Justice, Wilmington, DE, for appellant.

Bernard J. O'Donnell, Office of Public Defender, Wilmington, DE, for appellee.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS and RIDGELY, Justices, constituting the Court en banc.

STEELE, Chief Justice:

After receiving a sentence for his 14th DUI, the defendant, Gene Sloman, working with a TASC alcohol counselor, managed to obtain a recommendation for a sentence modification from a Superior Court Commissioner. A Superior Court judge—not the original sentencing judge—entered an Order adopting the Commissioner's recommendation. The State later learned of the modification and, before the original sentencing judge, moved to vacate the modification and to reinstate the original sentence on the grounds that there was no legal authority for the sentence modification. The original sentencing judge denied the State's motion and refused to vacate the modified sentence. Because the sentence modification resulted from ambiguous terms of the initial sentence and TASC's reasonable interpretation of those terms, the original sentencing judge's affirmation of the modification was carried out under his inherent authority to modify the original sentence. Accordingly, there was legal authority for the sentence modification. We, therefore, affirm the judgment of the Superior Court.

## I. Facts

In July 2003, Sloman drove his car through a red light at an intersection in New Castle County and collided with an oncoming vehicle. After Sloman refused to submit to a field-sobriety test, investigating police officers transferred him to a nearby hospital for evaluation. Doctors took a blood sample that revealed that Sloman had a blood-alcohol content of .30, three times the legal limit then in effect.

The following month, a grand jury indicted Sloman for driving under the influence of alcohol and other related offenses. Because Sloman had a record of at least four other DUI convictions, the latest charge constituted a felony and carried a six-month mandatory term of Level V incarceration. In September 2003, Sloman pleaded guilty to the DUI count and several other offenses.

On December 5, 2003 a Superior Court judge sentenced Sloman on two charges: 1) DUI; and 2) Driving After Judgment Prohibited. On the DUI charge Sloman received five years at Level V suspended after three years for decreasing levels of supervision. On the second charge the judge sentenced Sloman to the six month mandatory minimum. Sloman, thus, received 5½ consecutive years at Level V suspended after 3½ years under the terms of his initial sentence.

Sloman began serving his sentence on July 16, 2003. From July 16, 2003 to January 16, 2004, Sloman served his six-month mandatory sentence for Driving After Judgment Prohibited. Sloman then began his three-years at Level V for the DUI charge. Under the original sentence, then, Sloman would have been incarcerated under Level V supervision until January 16, 2007. Only after this point would Sloman have been able to enter the final phase of his original sentence: Level IV residential treatment. This is not how events ultimately unfolded.

On February 25, 2004 Sloman moved *pro se* for a reduction of his sentence pursuant to Superior Court Criminal Rule 35(b). The original sentencing judge denied this motion on March 11, 2004. While incarcerated, Sloman met with a Treat-

ment Access Center (TASC) case manager. Pursuant to TASC's statutorily-mandated mission "to coordinate the provision of substance abuse evaluation and treatment ... to criminal defendants,"[1] the case manager worked with Sloman to help address his alcohol-related problems. The case manager also sought and received a "fast track" conference before a Superior Court Commissioner to review Sloman's rehabilitation.

At the July 15, 2004 fast track hearing, at which no representative of the Department of Correction or Attorney General's office appeared, the case manager related Sloman's progress and noted that Sloman was scheduled to complete the TASC program before serving his full term of incarceration. In a "sort of like exploratory/modification request" before the Commissioner, the case manager asked that successful completion of the TASC alcohol program be an added condition of Sloman's sentence. The Commissioner granted the case manager's request.

On July 23, 2004 another Superior Court judge accepted the Commissioner's recommendation and adopted it. Under the terms of the Order, Sloman was still sentenced to five years at Level V. Unlike the original sentence (which required Sloman to serve three years at Level V), under the terms of the modified sentence, after the successful completion of the Level V TASC program ("Key"), Sloman's sentence would be suspended for a Level IV treatment program ("Crest"). After successful completion of the Level IV treatment program, Sloman would serve 90 days of work release at Level III. After the completion of the work release, the balance of the modi-

fied sentence was to be further suspended for 18 months at Level III.

Still unsatisfied with his modified sentence, Sloman filed a second Rule 35(b) motion for sentence modification on September 2, 2004. The original sentencing judge considered the second motion, and after citing the July 23 Order, denied Sloman's second motion.[2] While preparing its response to Sloman's second Rule 35(b) motion, the State first learned of the TASC proceeding, the Commissioner's findings, and the July 23 Order modifying Sloman's sentence. The State asserted that the July sentence modifications were illegal and unsupported by the "extraordinary circumstances" required to be shown before the Superior Court may consider an untimely Rule 35(b) motion. The State, therefore, separately moved for an Order vacating the July 23 Order.

Sloman's original sentencing judge presided at a November 2004 hearing on the State's motion to vacate. Although he was "not overjoyed with the downward modification of Level V time," he found that under the "totality of the circumstances," the July 23 Order should remain in effect. Because it is a "regular practice ... to amend these sentence Orders in terms of where we are suggesting that TASC can do it," the original sentencing judge found that "extraordinary circumstances"—as he apparently believed Rule 35(b) contemplated—existed to warrant the reduction in sentence.

The original sentencing judge, therefore, denied the State's motion to vacate Sloman's July 23 sentencing Order. On November 15, 2004, he then entered a new sentencing Order that reaffirmed the July 23 Order.[3] One of the Conditions of Su-

1. 11 *Del. C.* § 6582

2. *Sloman*, ID. No. 0307011701 (Sept. 24, 2004) (ORDER).

3. *See Sloman*, ID No. 0307011701 (Nov. 15, 2004) (Modified Sent. Order).

pervision under the work release portion of the new sentencing Order was that Sloman was not to possess or consume alcoholic beverages. The State appealed, claiming that the original sentencing judge abused his discretion by ratifying the July 23rd modifications to the original sentence in his final Order of November 2004.

As noted above, Sloman began his sentence for the DUI charge on July 16, 2004. During the course of all of the foregoing legal proceedings, Sloman was incarcerated at Level V. Under the terms of the modified sentencing Order approved on November 15, 2004, Sloman left Level V custody to go to Level IV on December 29, 2004.

On July 23, 2005, while his appeal in this Court was pending, Sloman consumed alcohol, thereby violating one of the conditions of his suspended sentence. At a sentencing hearing on August 17, 2005, the original sentencing judge re-sentenced Sloman based on the VOP. Under the terms of the sentence imposed after the VOP, Sloman received forty-three months (about three and one half years) at Level V, suspended after one year for decreasing levels of supervision.

With *en banc* oral argument scheduled before this Court for October 19, 2005, on September 30, 2005, Sloman moved to dismiss the State's appeal "as moot" because Sloman was re-sentenced after the VOP violation and the appeal no longer "affected the rights of the accused" as required under 10 *Del. C.* 9902(f). On October 6, 2005, we denied the motion to dismiss, and then heard oral argument, as scheduled, on October 19.

## II. Mootness

 Before addressing the merits of the State's appeal, we must first determine whether this appeal is moot because of Sloman's recent violation of probation and the Superior Court's re-sentencing of Sloman. 10 *Del. C.* 9902(f) provides, "[t]he State shall have an absolute right to appeal any sentence on the grounds that it is unauthorized by, or contrary to, any statute or court rule, in which case the decision or result of the State's appeal shall affect the rights of the accused." We recognize that generally speaking, the Superior Court retains jurisdiction to modify or revoke a defendant's probation even when the defendant's appeal is pending.[4] Accordingly, in normal circumstances, once a defendant violates the terms of his probation, the Superior Court has the authority to require a defendant to serve the sentence initially imposed, or any lesser sentence.[5] The circumstances in this case, however, are not normal by any reasonable definition.

Under the original December 2003 sentence, Sloman should have been incarcerated until January 16, 2007. Instead, a Superior Court Commissioner recommended—and two Superior Court judges ultimately accepted—what the State contends was an illegal sentence modification unsupported by Court Rule or statute. On July 23, 2005—at a time when he would have been incarcerated under the original sentence—Sloman violated the probation conditions of the *modified* sentence. The Superior Court judge then re-sentenced Sloman to forty-three months, suspended

---

**4.** *See e.g., Jackson v. State,* 926 P.2d 1180 (Alaska Ct.App.1996); *United States v. Becker,* 536 F.2d 471, 473 (1st Cir.1976); *United States v. Lindh,* 148 F.2d 332, 333 (3rd Cir. 1944); *State v. Dubish,* 236 Kan. 848, 696 P.2d 969, 973 (1985); *Minovich v. State,* 18 Md.App. 368, 306 A.2d 642, 647 (1973), *cert. denied,* 415 U.S. 930, 94 S.Ct. 1441, 39 L.Ed.2d 488 (1974).

**5.** 11 Del. C. § 4334(c).

after one year, effective on July 26, 2005. Under the terms of the sentence imposed after the VOP, Sloman will be incarcerated at Level V until July 26, 2006.

Thus, as the State notes, even if Sloman were to serve the entirety of the VOP sentence he received in July 2005, he still receives the benefit of a reduction of his sentence of more than one year.[6] It makes no difference that when he was re-sentenced after the VOP violation that Sloman was subject to being returned to Level V incarceration for the balance of the suspended sentence. Nor does it matter that he was at risk of being sentenced to Level V for a period (five years) longer than the actual incarceration (three years) that the State asks us to require the Superior Court to re-impose. It only matters that the sentencing judge was able to re-sentence for a VOP because of an allegedly illegal modification of the original sentence.

■ We recognize that a sentence entered after a VOP usually supersedes the earlier sentence that initially set the terms of the probation. That is, after a defendant is re-sentenced, the earlier sentence is no longer in effect. Indeed, in this case, neither the sentence originally imposed nor the modified sentence which the State sought to have the Superior Court vacate, is in effect as of this time. Thus, it might be argued that Sloman's VOP sentence supersedes the earlier sentences in his case. Neither the State nor Sloman appealed the VOP sentence to this court.

And, the argument would conclude, because the VOP sentence Sloman is now serving governs his custody status and because no party appealed, the State's appeal from the original sentence is moot. This argument misses the mark.

But for the allegedly illegal sentence recommendation by the Commissioner, the allegedly illegal July 23, 2004 Order by the Superior Court judge accepting that recommendation, and the allegedly illegal November 15, 2004 Order by the original sentencing judge reluctantly refusing to vacate the July 23 Order, Sloman would never have been able to "drink a beer" on July 23, 2005 and would never have violated the terms of his probation. Absent any allegedly illegal sentence modification, Sloman would have remained in prison through 2007. The State argues on the merits that the July 23 Order was illegal and that the November 15 Order did nothing to cleanse that illegality. Were we to dismiss the State's appeal as moot Sloman would receive the benefit of an allegedly illegal sentence modification and then would be able to end any inquiry into the validity of the modified sentence by violating his probation under the terms of the modified sentence. In short, Sloman would receive a one year windfall reduction of his original sentence. In this case, if we were to decide that the sentence modification was unlawful we would be required to reverse and remand with instructions to impose the original December 2003 sentence.[7] In that case, Sloman

6. Sloman was released from Level V to Level IV on December 29, 2004 and was re-sentenced for the VOP violation on July 26, 2005. This constitutes a seven month time period when Sloman would have been incarcerated under the terms of the original sentence. Moreover, under the terms of the July 2005 VOP sentence, Sloman will be released from Level V in July of 2006, about six months

earlier than he would have been released under the original sentence.

7. *See State v. Lennon,* 818 A.2d 971 (TABLE). In *Lennon,* the trial court sentenced the defendant to five years at Level V suspended upon completion of the successful completion of a rehabilitation program. We concluded that the crime for which the defendant was sentenced required a mandatory minimum of

would "owe" the State approximately one more year at Level V.

We do not mean to suggest that in no case can a State's appeal from an allegedly illegal sentence ever be rendered moot by a defendant's later VOP and a Superior Court's re-sentencing pursuant to that VOP. In this case, for example, if *hypothetically,* after the VOP violation, the Superior Court judge had re-sentenced Sloman to serve all three years of the suspended sentence at Level V for the DUI conviction and all other terms of the VOP sentence matched the original sentence, the State's appeal would be moot. In short, in that *hypothetical* case, Sloman would owe three years at level V under the terms of the original sentence and under the terms of the modified sentence as imposed after the VOP violation; the State's appeal concerning the illegality of the modified sentence would not affect the rights of the accused. In this case, however, our decision about the legality or illegality of the sentence modification directly affects Sloman's rights: our resolution of the legal issue in this case directly determines whether Sloman must serve an additional year at Level V. The issue in this case is not moot. Therefore, we now turn to a discussion of the arguments on the merits.

### III. Merits

■ The parties frame the issue in this case as whether the modification of Sloman's sentence was illegal because it was not supported by "extraordinary circumstances" as required by Rule 35(b). We decline to reach that issue because we think this case is more appropriately about whether or not to give effect to the original sentencing judge's initial sentencing

Order. As part of the December 2003 sentencing Order, the original sentencing judge included provisions directing TASC to (1) monitor the defendant; and (2) evaluate the defendant for substance abuse. At the hearing on the motion to vacate the July "modification" of Sloman's sentence, the original sentencing judge explained how the bizarre set of circumstances in this case happened:

*[It all] started with the conditions of probation in my original sentence order.* What I gave him was three years, which I felt was deserved at the time because this was at least his 14th DUI, as I recall. And I had two things in the sentence order which I issued on September 5th [sic-December 5th] last year, which was that TASC will monitor his treatment and TASC will evaluate the defendant for substance abuse.

Now, *under current procedures, that is a directive to TASC to conduct an evaluation,* which they did. That evaluation determined that he should go into Key. That recommendation was brought before Commissioner Vavala on his regular TASC calendar. He does a lot of these, anyway, a substantial number of cases come to him through TASC, *and that is because of court orders that set them in motion,* basically, and that's what he did when he entered his order on July 23, 2004 placing him into Key and then to go to Level IV Crest once he's completed with the Key Program. I was not aware of this modification until Mr. Wallace mentioned to me in passing, and I checked into it, and found out how it got on the TASC calendar. Whether it was a regular calendar of this Court for TASC monitoring, most of

not less than two years at Level V. Under the trial judge's Order, we noted that the defendant could potentially be released in as little as eleven months. Accordingly, we reversed

and remanded so that the trial judge could impose the required mandatory minimum sentence.

the time, it is basically just an oversight function of people who are under TASC supervision and may need some sentence correction that can be handled by a Commissioner in terms of an initial recommendation...

...*[T]he whole train was set in motion by my sentence order and the ambiguity, frankly, of that sentence order.*

If I may say a couple of other things in this regard, because I was a little bit concerned—quite a bit concerned, to be honest with you—when I found out about this and did some checking. It has led me to set up a series of meetings with TASC people and some others to develop more precise language. This is one where if I had felt that this was going to have a result like this; that is, that there would be a switch just from a straight three-year Level V to three years at—or five years, if you will, looking at [second sentencing judge's] order of July 23rd, it would be to Key, then I would have had it returned to me for reevaluation.

And as far as another, there are very, very, few of these cases, in talking to Commissioner Vavala, who handles these calendars, where this kind of situation arises, *but it was set in motion by my sentence order and TASC's reading of that sentence order.*

One of the things that we're going to be [PAGE 13][8] doing is to develop language for sentence orders that will provide that if something like this is going to happen, where there's a modification in a Level V sentence, that, in effect, either reduces it or does something like this, that it will come back to the original sentencing judge. That is an internal operating thing that this case has

served as a good example of, in terms of how we handle it, as well as the language that we put in the sentence order. *But it was all set in motion by my language. It was in the sentence order, and how at the time TASC interpreted such sentence orders.*

Now I am not going to second-guess at this point what I would have done five months ago if this matter had been brought to my attention in this fashion. I'm just not going to say that, because I don't know. I don't think that is instructive at this point, whether I would have agreed with the recommendation or not agreed with the recommendation. We are where we are today. And I wanted to explain how we got here, how he got on the calendar. *It was not at his initiative. It was at the initiative of TASC that was carrying out what it believed was the* [PAGE 13] *intent of my sentence order, an intent ambiguously, and, frankly, mistakenly stated, regarding when I thought the evaluation would take place.*

My original intent was that the evaluation would take place once he served his sentence and was out on conditional release, or an evaluation would take place while he was in Level V, so that this would be—the treatment program would be in place for him once he was released on conditional release. *That was my intent, but it was not stated in the sentence order.* Sentence order language in the very near future—and other judges have been alerted to issues like this—but what I can determine, there are very, very, very few of these orders where something like this might have happened, based on my conversations with Commissioner Vavala, who has these calendars twice a week.

---

8. The State omitted this page from the Appendices we received with the briefs. Page 13 was only available after looking at the full record.

Now, back to this case. *He's now been put in Key as a result of this sentence order.*

The next step normally would be to go to Level IV Crest in order to maximize the advantage of Key. He's to be held at Level V pending that Level IV available space. I don't know what will—how long that would take, and then it would be followed by 18 months Level III Crest Aftercare. That is the current sentence order as far as I can tell. And that is the sentence order.... It was a sentence order signed by a Judge of this Court, going through what was the process in this Court, without anything I can see that was contrary to practices at that time, but was not a 4217 sentence modification request from the Department of Correction.

Considering the totality of the circumstances, I am not going to amend that sentence order at this point.

I'm not overjoyed with the downward modification of Level V time, because of the reason that I stated in the original moment of sentencing back in December 2003 regarding Mr. Sloman's serious DUI record.

At this point, Mr. Wallace, the Deputy Attorney General in this case interrupted the judge:

**Mr. Wallace:** Your Honor, for clarification purposes, can I ask the Court, then, under what authority this was granted?

I mean, I'm just trying to place it into a framework as to what rule or statute permitted this reduction.

**The Court:** 35(b).

**Mr. Wallace:** And where was the 35(b) motion filed?

**The Court:** Extraordinary circumstances.

**Mr. Wallace:** Under—where was the Rule 35(b) motion filed?

**The Court:** Mr. Wallace, this is a regular practice of this court to amend these sentence orders in terms of where we are suggesting that TASC can do it.

**Mr. Wallace:** Your Honor, you're saying that a TASC work officer can call this court, put a person on a calendar, and get a Rule 35(b) motion granted?

**The Court:** Mr. Wallace, you've missed the point here.

**Mr. Wallace:** No, I haven't missed the point at all, Your Honor.

The Court: No, you missed the point. *He was following out my sentence order as TASC, not just that one worker, interpreted it at the time.* They now understand the situation. I have corrected this with Commissioner Vavala. We are setting a series of motions; unfortunately, it took this case to find out that there were some gaps in the system in this regard.

**Mr. Wallace:** Your Honor, nowhere in the sentence—in the Court's original sentence does it say a TASC officer can file a 35(b) motion on behalf of a defendant. And nowhere do the rules or anything else permit an unlicensed representative or counsel is what the court would be basically putting a TASC worker in the position of without notice to the State.

**The Court:** All right. You can have a deputy attend every TASC calendar. That's what you're going to have to do if you're not there .... The motion is denied .... *My sentence order says it would be a TASC evaluation. It came back with an evaluation, he ended up on our routine, years-long, years-of-practice TASC calendar for sentence modifications, and it's signed by a Judge.*

We find the sentencing judge's explanation of these circumstances entirely plausible and reasonable. Although the sentencing judge, in response to the Attorney General's forceful prodding, purportedly relied upon Rule 35(b) and the "extraordinary circumstances" language in that rule to justify the sentence modification, we affirm on the basis of a different rationale than that articulated by the sentencing court.[9]

The sentencing judge included two admittedly ambiguous provisions in his original sentencing Order. Given the ambiguity of the provisions, TASC's reasonable interpretation of the original sentencing Order resulted in an evaluation earlier than the original sentencing judge would have preferred. "It is a basic principle of jurisprudence that courts are generally afforded inherent powers to undertake whatever action is reasonably necessary to ensure the proper administration of justice. This Court has consistently held that Delaware courts have the inherent power to vacate, modify or set aside their judgments or Orders."[10] Implicit in the original sentencing Order was a directive to TASC to follow the routine, years-long, years-of-practice procedures with respect to evaluations of defendants in custody. Also implicit in the original sentencing Order was the power to amend that Order to ensure the proper functioning of the TASC program and the administration of justice in these particular circumstances. "Imposition of a sentence is within the discretion of the trial court and, whenever possible, effect should be given to its intent."[11] As the original sentencing judge noted, TASC

reasonably interpreted the ambiguous provisions in his December 2005 Order. The sentence modification was merely an attempt to give effect to the intent of the original sentencing judge in crafting his original Order. In essence, the TASC worker was acting at the direction of the original sentencing judge.

Although Rule 35(b) normally operates as a check on a sentencing judge's inherent authority to modify a sentence, where a judge, in his sentencing Order, reserves that authority to modify a sentence upon the occurrence of certain conditions, Rule 35(b) is not implicated at all. Absent the two provisions in the original sentencing Order directing TASC to conduct an evaluation, the only grounds for a sentence modification would be either Rule 35(b) or 11 *Del. C.* § 4217. The sentencing Order in this case, however, reserved to the original sentencing judge the authority to modify the sentence. Accordingly, while the original sentencing judge may have cited an incorrect basis for his authority to vacate the July sentence modification, his inherent authority to modify the initial sentence based on the terms of the original sentence itself justified the denial of the State's motion to vacate the modified sentence. In the absence of a Court Rule or statutory mandate compelling us to do so, we will not interfere with "routine, years-long, years-of-practice" internal operating procedures of the Superior Court.[12]

## IV. Conclusion

For the foregoing reasons, the November 15, 2004 Order of the Superior Court

9. *Unitrin, Inc. v. American General Corp.*, 651 A.2d 1361, 1390 (Del.1995)

10. *State v. Guthman*, 619 A.2d 1175, 1178 (Del.1993) (citations omitted).

11. *Nave v. State*, 783 A.2d 120, 123 (Del.2001)

12. Based on what the original sentencing judge stated in the transcript of the November

12, 2004 hearing on the State's Motion to Vacate, we are satisfied that the circumstances that occurred in this case will never arise again. The Superior Court judges will develop language for provisions in sentencing Orders to ensure that a sentencing judge's intent is not articulated imprecisely.

refusing to vacate the July 2004 sentence modification is **AFFIRMED.** Sloman's custody status is governed by the sentence entered pursuant to the VOP violation.